## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| BELL BCI COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 03-1613C |
| ) | Judge Wolski |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

### PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia  22102-4225
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
E-mail: r.wolf@mooreandlee.com

Dated: July 15, 2005

Counsel for Plaintiff



EXHIBIT
9

## TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES..................................................................... ii

I.     SUMMARY.................................................................................... 1

II.    STATEMENT OF THE CASE..................................................... 2

III.   APPLICABLE LEGAL STANDARDS......................................... 8

       A.    SUMMARY JUDGMENT........................................................ 8

       B.    CONTRACT INTERPRETATION.............................................. 8

       C.    WAIVER AND ACCORD AND SATISFACTION.............................. 9

       D.    DISTINCTION BETWEEN DELAY AND INEFFICIENCY CLAIMS........... 10

       E.    LIQUIDATED DAMAGES...................................................... 11

IV.    ARGUMENT.................................................................................. 12

       A.    PARTIAL SUMMARY JUDGMENT SHOULD BE ENTERED IN
             BELL'S FAVOR HOLDING THAT NO PORTION OF BELL'S
             LABOR INEFFICIENCY AND CUMULATIVE IMPACT CLAIMS IS
             BARRED OR WAIVED BY ACCORD AND SATISFACTION................. 12

       B.    PARTIAL SUMMARY JUDGMENT SHOULD BE ENTERED IN BELL'S
             FAVOR HOLDING THAT THE GOVERNMENT HAS IMPROPERLY
             ASSESSED LIQUIDATED DAMAGES......................................... 17

V.     CONCLUSION................................................................................ 19

# TABLE OF AUTHORITIES

PAGE NO.

FEDERAL CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)................................ 8

A Olympic Forwarder, Inc. v. United States,
33 Fed. Cl. 514 (1995)................................................................. 8, 9, 14

Atlantic Dry Dock Corp. v. United States,
773 F. Supp. 335 (M.D. Fla. 1991)................................................... 15, 16

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)................................ 8

Chesapeake & Potomac Telephone Co. of Virginia v. United States,
228 Ct.Cl. 191, 654 F.2d 711 (1981)..................................................... 17

Firestone Tire & Rubber Co. v. United States,
195 Ct.Cl. 21, 444 F.2d 547 (1971)................................................. 8, 9, 16

Hol-Gar Mfg. Corp. v. United States,
169 Ct.Cl. 384, 351 F.2d 972 (1965)................................................... 9, 15

Jackson Construction Co. v. United States,
62 Fed. Cl. 84 (2004)............................................................... 10, 12, 14

PCL Construction Services, Inc. v. United States,
53 Fed. Cl. 479 (2002)................................................................. 11, 17

Reliance Ins. Co. v. United States,
20 Cl.Ct. 715 (1990)...................................................................... 9

Sauer, Inc. v. Danzig,
224 F.3d 1340 (Fed. Cir. 2000)....................................................... 10, 14

Sipco Services & Marine, Inc. v. United States,
41 Fed. Cl. 196 (1998)................................................................. 9, 13

United States v. United Engineering & Constructing Co.,
234 U.S. 236, 49 Ct.Cl. 689, 34 S.Ct. 843, 58 L.Ed. 1294 (1914)..................... 11

U.S. Industries, Inc. v. Blake Construction Co., Inc.,
671 F.2d 539 (D.C. Cir. 1982)........................................................... 10

PAGE NO.

FEDERAL CASES (cont.)

Youngdale & Sons Constr. Co. v. United States,
22 Cl.Ct. 345 (1991)................................................................    9


STATE CASES

Atlantic Coast Mechanical v. R.W. Allen Beers Construction,
264 Ga. App. 680, 592 S.E.2d 115 (2003)................................................    10, 11


STATUTES

Government Performance and Results Act,
31 U.S.C. §§ 1115................................................................    6


REGULATIONS

48 C.F.R. § 52.243-4................................................................    11

**PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Court's Rules, the plaintiff, BELL BCI Company ("BELL"),
respectfully cross-moves for partial summary judgment and opposes the Motion for Partial
Summary Judgment Regarding Accord and Satisfaction filed by the defendant, the United States
("Defendant" or "Government") (hereinafter referred to as the "Government's Motion"). The
Government also moved to dismiss Count VI of BELL's Complaint, which was based on
promissory estoppel. BELL hereby stipulates that Count VI may be dismissed.

I.    **SUMMARY**

BELL's cross-motion for summary judgment addresses two principal issues. First, BELL
seeks partial summary judgment holding that no portion of its claims for labor inefficiency and
cumulative impact is barred or waived by the doctrine of accord and satisfaction. The
Government's assertion that accord and satisfaction bars a portion of BELL's labor inefficiency
and cumulative impact claims is refuted by the terms of the parties' contract modifications, the
parties' objective manifestations of intent, the Government's contemporaneous records, the
deposition testimony of the Government's Rule 30(b)(6) designee, and the uncontradicted
affidavit submitted herewith. In short, such claims were never part of the negotiations that
culminated in the several contract modifications upon which the Government relies, the
Government did not provide any consideration for purportedly relinquishing such claims and,
therefore, such claims are not barred by accord and satisfaction.

Second, BELL seeks partial summary judgment holding that the Government has
improperly assessed liquidated damages. As set forth below, the Government has relied solely
on one of its proposed expert witnesses to support its assessment. The Government's proposed
expert, however, has admitted that he has not performed the necessary analysis to determine

1

whether BELL may be responsible for liquidated damages for purportedly not meeting certain contractual interim milestones. Thus, the Government has not and cannot meet its burden of going forward, nor its ultimate burden of proof.

## II.    STATEMENT OF THE CASE

In accordance with Rule 56(h)(2) of the Court's Rules, the undisputed material facts underlying this case and BELL's Cross-Motion are set forth in the accompanying Plaintiff's Proposed Findings of Uncontroverted Fact (referred to as "PPF"). Accordingly, BELL shall only briefly recite the key undisputed material facts.

This case arises out of a contract (the "Contract") between BELL, a general contractor, and the Government concerning the construction of a new laboratory research building, referred to as NIH Building 50, located at the National Institutes of Health's ("NIH") Bethesda, Maryland campus (hereinafter the "Project" or "Building 50" or "Stokes Laboratories"). The Government retained an architectural design firm, HLM Design, to prepare the Project design plans and specifications, and CRSS Constructors, Inc. (which was later acquired by Jacobs Facilities, Inc. (hereinafter "CRSS/Jacobs") to be its construction quality manager. See PPF, ¶¶ 2-4.

Building 50 was originally designed to be a five-story structure, with a full and functional basement area. The Government issued Notice to Proceed ("NTP") to BELL on April 1, 1998. From April 1998 through December 1998, the Government made only a few changes to the scope of BELL's work and BELL was completing its work on schedule. See PPF, ¶ 8 and ¶ 13.

In December 1998, however, the Government initiated a series of events and changes to the Project that ultimately disrupted virtually every aspect of BELL's performance and made it impossible for BELL to complete the work in an efficient, timely and cost-effective manner. In mid-December 1998, the Government determined that it had a Project budget surplus of

2

$15,600,000.00. Through HLM Design, the Government Prepared a Feasibility Study (the

"Government's Feasibility Study") for using that budget surplus to add an entire extra floor to

the Project, changing the structure from five to six stories. The proposed extra floor, referred to

as the "new 4th Floor," was to be inserted on top of the originally designed 3rd Floor. See PPF,

¶¶ 14-15, ¶ 19, and ¶ 22; and Government's Feasibility Study, Ptf. App. at 39.

In this litigation, the Government asserts that BELL "jointly developed" the design of the

new 4th Floor. See Government's Proposed Findings of Uncontroverted Fact, ¶ 4. That assertion

is not true; BELL did not design, jointly or otherwise, the new 4th Floor. See PPF, ¶¶ 18-19.

The Government's own contemporaneous records indisputably show that the Government's

architect for the Project, HLM Design, prepared the design for the new 4th Floor. See

Government's Feasibility Study, Ptf. App. at 39; and Government's Justification for Other Than

Full and Open Competition (the "Government's JOFOC"), Ptf. App. at 46 (stating that final

design plans "will be complete and ready to issue to the contractor [BELL] in early March.").

The record further shows that the Government represented it would provide BELL with the final

design documents by March 1999, if not sooner. See PPF, ¶¶ 26-27; Government's Executive

Report, Ptf. App. at 42; and Government's JOFOC, Ptf. App. at 46.

The Government expressly and repeatedly represented to BELL, both orally and in

writing, that the new 4th Floor would be a duplicate of the original 3rd Floor. See PPF, ¶ 20 and

¶¶ 22-24; Government's Feasibility Study, Ptf. App. at 39-40; Government's Executive Report,

Ptf. App. at 41-42. Indeed, the Government's JOFOC repeated this representation, and the

Project Officer and the Contracting Officer verified its accuracy. See Government's JOFOC, Ptf.

App. at 47-48.

Contrary to its repeated contemporaneous representations, in this litigation the Government "specifically denie[d] that NIH represented that the new floor would follow the original third floor design . . ." See Defendant's Answer, ¶ 22. The Government's own contemporaneous documents, however, indisputably show that there is no factual basis for the Government to make such a "specific" denial.

On January 14, 1999, in reliance on the Government's repeated representations that the new 4th Floor would be a duplicate of the 3rd Floor and that the final design documents would be received by no later than March 1999, BELL submitted a price proposal to the Government to construct the new 4th Floor for approximately $9.8 million, and for a 90 calendar-day extension of time. See PPF, ¶¶ 28-29; and BELL's January 14, 1999 Price Proposal, Ptf. App. at 49-50. BELL's price proposal expressly stated that it was submitted pursuant to the Government's Feasibility Study which, as noted above, represented that the new 4th Floor would duplicate the 3rd Floor.

The negotiations between BELL and the Government relating to the new 4th Floor proceeded in three phases. The first phase involved the structural steel and concrete work for the 4th Floor. The second phase involved certain changes to the 4th Floor by the Government that were made after BELL submitted its price proposal. The third phase involved certain "fit out work" on the new 4th Floor that the Government added after BELL submitted its initial price proposal, and which the Government unilaterally directed BELL to perform. See PPF, ¶¶ 33-50.

The parties' cross-motions primarily concern the third phase of negotiations, which culminated in the execution of Modification 93 ("Mod. 93"). During the third phase of negotiations, the Government represented to BELL that, after August 2000, there would be no more than 4 or 5 minor additional changes to the Project. In order to minimize impacts to the

4

Project Schedule, it was agreed that the Government would pay BELL to perform these few

additional changes on an accelerated basis. In reliance on the Government's representations,

BELL agreed to Mod. 93. See PPF, ¶¶ 48-50.

Mod. 93 did not include any payment for labor inefficiencies or cumulative impact.

Rather, the provisions of Mod. 93, reflecting the negotiations preceding it, provided only

compensation for direct costs of the work and delay (i.e., extended performance duration), not

labor inefficiencies nor the cumulative impacts of changes issued prior to it. See PPF, ¶¶ 55-57.

As the Government's Rule 30(b)(6) designee succinctly put it, Mod 93 "was the mod. where we

paid [BELL] for delays up to that date, and that was it . . . They accepted that mod. as all of the

delays up to that date, whatever was issued." See Government's RCFC Rule 30(b)(6) Dep. Tr. at

p. 51, Lines 10-14, Ptf. App. at 23 (emphasis added).

In relevant part, Mod. 93 states as follows:

4.   **Increase the contract amount by $2,296,963 ($4,100,000-$1,803,037 from
     Mod 77 [actually Mod 78]) as full and equitable adjustment for the
     remaining direct and indirect costs of the Floor 4 Fit-out (EWO 240-R1) and
     full and equitable adjustment for all delays resulting from any and all
     Government changes transmitted to the Contractor on or before August 31,
     2000.**

5.   **This agreement does not in any way affect entitlement to the direct cost of
     performance of any disputed changes. It does; however, incorporate the time
     impact of any disputed changes issued on or before August 31, 2000.**

See Mod. 93, Ptf. App. at 63-64 (emphasis added). In addition, Mod. 93 established a Contract

completion date of April 30, 2001, created 14 interim milestones, and assigned a liquidated

damage amount of $266.00 per calendar-day to each individual interim milestone. Id.

After Mod. 93 was agreed to, and contrary to its representations to BELL, the

Government issued numerous changes and refused to pay BELL to perform the changed work on

an accelerated basis. BELL had to generate approximately 300 more extra work orders after

5

August 31, 2000, and over 90 additional Contract modifications were issued thereafter. See PPF, ¶¶ 62-63.

Moreover, the Government began to issue directives to BELL to perform additional work with no impact to the Project schedule and stated in writing that it was reserving its rights against BELL. As a result of the Government's actions, BELL determined that it was prudent to reiterate that it was reserving its rights with regard to such claims. Accordingly, BELL repeatedly notified the Government in a series of executed contract modifications, and in other writings, that it expressly reserved its right to seek an equitable adjustment for the delays and impacts that BELL was suffering due to the Government's ongoing changes. See Mods. 142, 144-145, 147-149, 152, 156, 159-160, 162-173, 175-176, 178-200, 202-205, Ptf. App. at 77-127.

On or about February 5, 2002, BELL substantially completed the changed work that the Government had directed. But for the number and magnitude of changes that the Government issued after Mod. 93, Bell would have met all of the interim milestone completion dates set forth therein. See Affidavit of Jeremy Bardin, ¶ 44, Ptf. App. at 10.

In February 2002, NIH represented to the United States Congress that the Project was completed on schedule. Pursuant to its statutory reporting obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31 U.S.C. §§ 1115, et seq., NIH issued its "Final FY 2003 GPRA Annual Performance Plan, Revised Final FY 2002 GPRA Annual Performance Plan, and FY 2001 GPRA Annual Performance Plan" (hereinafter "NIH's GPRA Report"). NIH's GPRA Report stated that, "NIH completed construction of the Stokes Laboratories building [50] on schedule." See NIH's GPRA Report, Ptf. App. 17 (emphasis added). Notwithstanding the NIH GPRA Report that the Project was completed on schedule, the Government subsequently asserted that BELL did not complete its work on schedule and has

assessed liquidated damages against BELL of $447,678.00.  See Daigle Dep. Tr. at p. 63, Lines 2-10, Ptf. App. at 32.

On April 5, 2002, in accordance with the provisions of the Contract, BELL timely submitted to the Contracting Officer a Request for Equitable Adjustment ("REA").  On that date, BELL also timely "passed through" to the Contracting Officer five Requests for Equitable Adjustment prepared by subcontractors to BELL on the Project, to wit, Young Electrical Contractors, Inc., Stromberg Metal Works, Inc., Manganaro Corporation, NLP Enterprises, Inc., and ISEC, Inc. (hereinafter the "Subcontractors' REAs").  On July 1, 2002, the Contracting Officer issued a final decision denying BELL's REA and the Subcontractors' REAs.  See PPF, ¶¶ 72-74.

The Government relies solely upon one of its proposed expert witnesses, Ted Scott, to allocate all responsibility for delay as between BELL and the Government, including the assessment of liquidated damages against BELL for allegedly being unable to meet the interim milestones established in Mod. 93.  See Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. 19; Government's 1/13/05 letter, Ptf. App. 34-35.  Mr. Scott concedes that, in order to determine whether liquidated damages could properly be assessed against BELL for allegedly not meeting the interim milestones, it would be necessary to analyze the effect that Government changes had on the work relating to each individual milestone.  Mr. Scott has admitted, however, that he did not perform any such analysis.  See Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 14, Ptf. App. 27-28.

7

## III.   APPLICABLE LEGAL STANDARDS

### A.   SUMMARY JUDGMENT

Rule 56(c) of the Court's Rules provides that "[t]he judgment sought shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Summary judgment will be

entered "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

(1986).

The Court views the record as a whole and in the light most favorable to the non-moving

party. A Olympic Forwarder, Inc. v. United States, 33 Fed. Cl. 514, 518 (1995) (citations

omitted). If, however, the evidence is so one-sided that one party must prevail as a matter of

law, summary judgment shall be entered in that party's favor. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 251-252, 106 S.Ct. 2505, 2511-2512, 91 L.Ed.2d 202 (1986).

### B.   CONTRACT INTERPRETATION

It is well-settled that the overriding rule of contract interpretation is that "the language of

a contract must be afforded the meaning derived from the contract by a reasonably intelligent

person acquainted with the contemporary circumstances." Firestone Tire & Rubber Co. v.

United States, 195 Ct. Cl. 21, 444 F.2d 547, 551 (1971) (citation omitted). This often requires

the Court to place itself "into the shoes of a 'reasonable and prudent' construction contractor

when [it] consider[s] the language of the contract and attempt[s] to divine its meaning." Id., 444

F.2d at 551 (citation omitted).

Furthermore, "[a] principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Sipco Services & Marine, Inc. v. United States, 41 Fed. Cl. 196, 213 (1998) (citation omitted). "This bedrock of contractual analysis has withstood the test of time undiminished, and has attained an even greater measure of significance in the complex field of Government contracts." Firestone Tire & Rubber Co., 444 F.2d at 551 (citations omitted).

"Thus, in its interpretation of the contract, the court will give weight to what the parties initially believed their respective obligations to be prior to any dispute." Id. at 213 (citations omitted). Accordingly, the Court strives to give "reasonable meaning" to all parts of the contract documents, rather than interpret it in a way "which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous...." Hol-Gar Mfg. Corp. v. United States, 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965) (citations omitted). Finally, the party that drafted the contract "must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence." Firestone Tire & Rubber Co., 444 F.2d at 551.

C.     WAIVER AND ACCORD AND SATISFACTION

"[I]t is a well established rule of law that 'waivers of rights must be voluntary, knowing and intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" Reliance Ins. Co. v. United States, 20 Cl.Ct. 715, 723 (1990) (citations omitted). "Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit." Youngdale & Sons Constr. Co. v. United States, 22 Cl.Ct. 345, 346 (1991). Accord, A Olympic Forwarder, Inc., 33 Fed. Cl. at 521.

"The party asserting an accord and satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) <u>a meeting of the minds</u>; and (4) <u>consideration</u>." <u>Jackson Construction Co. v. United States</u>, 62 Fed. Cl. 84, 92 (2004) (emphasis added). In determining whether the movant has met its burden, "the Court must look beyond the mere existence or nonexistence of any release language or reservation of rights in a bilateral modification" in order to determine whether there has been an accord and satisfaction. <u>Id</u>. "Therefore, the <u>Court must focus on whether or not the parties' objective manifestations of intent demonstrate that they reached a meeting of the minds with the respect to additional claims</u>." <u>Id</u>. at 93 (emphasis added). Finally, "even if the parties have executed a clear and unambiguous release, this Court can void or reform the release on several grounds, including <u>lack of consideration</u>, lack of performance, lack of authority, unilateral or mutual mistake, misrepresentation, duress, <u>or under other circumstances in which the parties' conduct evinces an intent to allow additional claims</u>." <u>Id</u>. (emphasis added).

## D.    DISTINCTION BETWEEN DELAY AND INEFFICIENCY CLAIMS

As a matter of law, there is a distinction between a claim for delay and claim for labor inefficiency and disruption. <u>E.g.</u>, <u>Sauer, Inc. v. Danzig</u>, 224 F.3d 1340, 1348 (Fed. Cir. 2000) ("We agree with Sauer that it need not establish delay to overall contract completion to succeed on its disruption claim."). The principle distinction between a disruption claim and a delay claim is that '[u]nlike the delay claim, the disruption claim is intended not to redress [the contractor's] loss from being unable to work, but to compensate [the contractor] for the damages it suffered from [the owner's] actions that made its work more difficult and expensive than [the contractor] anticipated that it should have been. <u>U.S. Industries, Inc. v. Blake Construction Co., Inc.</u>, 671 F.2d 539, 546 (D.C. Cir. 1982). <u>Accord</u>, <u>Atlantic Coast Mechanical v. R.W. Allen Beers</u>

10

Construction, 264 Ga. App. 680, 684, 592 S.E.2d 115, 118 (2003) (holding that "no damages for

delay" clause in contract did not bar disruption claims).

Similarly, the Federal Acquisition Regulations ("FAR") differentiates between claims

based on delay and those based on disruption or inefficiency. For example, the standard FAR

"changes" clause regarding equitable adjustments distinguishes between a matter that "causes an

increase or decrease in the Contractor's cost of, or the time required for, the performance of any

part of the work under this contract, whether or not changed." 48 C.F.R. § 52.243-4 (1986).

### E.    LIQUIDATED DAMAGES

As a matter of law, "[t]he government has 'the ultimate burden of persuasion as well [as]

the initial burden of going forward to show that the contract was not completed by the agreed

contract completion date and that liquidated damages were due and owing.'" PCL Construction

Services, Inc. v. United States, 53 Fed. Cl. 479, 484 (2002) (citation omitted). "The government

may meet its initial burden by showing that 'the contract performance requirements were not

substantially completed by the contract completion date and that the period for which the

assessment was made was proper.'" Id. at 484 (emphasis added) (citation omitted). "The

general rule . . . that, once the government has met its initial burden of going forward, the

contractor must prove excusable delays to be relieved of all or part of the liquidated damages

assessed, has not been applied, however, when the government has contributed to the delay of

the completion of the contract." Id. In United States v. United Engineering & Constructing Co.,

234 U.S. 236, 242, 49 Ct.Cl. 689, 34 S.Ct. 843, 58 L.Ed. 1294 (1914), the United States Supreme

Court held that in order to enforce a liquidated damages clause, the government 'must not

prevent the performance of the contract within the stipulated time[.]' When performance of the

11

contract is delayed by the government and the contractor, 'the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived.'" Id.

## IV.    ARGUMENT

### A.    PARTIAL SUMMARY JUDGMENT SHOULD BE ENTERED IN BELL'S FAVOR HOLDING THAT NO PORTION OF BELL'S LABOR INEFFICIENCY AND CUMULATIVE IMPACT CLAIMS IS BARRED OR WAIVED BY ACCORD AND SATISFACTION

The parties' cross-motions present the issue of whether BELL is precluded from maintaining a portion of its labor inefficiency and/or cumulative impact claims. The Government asserts that the doctrine of accord and satisfaction precludes BELL from pursuing any claims attributable to the changes covered by Mods. 93-140, with particular emphasis on Mod. 93.[1] The Government's assertion fails, however, because it cannot prove the required elements of accord and satisfaction and, contrary to the well-settled principles of contract interpretation, it interprets the subject modifications in a way that ignores several of their express provisions.

As noted above, it is the Government's burden to establish the elements of accord and satisfaction. See Jackson Construction Co., 62 Fed. Cl. at 92. As part of its analysis, the Court will "look beyond the mere existence or nonexistence of any release language or reservation of rights in a bilateral modification" and focus on the parties "objective manifestations of intent" in

---

[1]    It is undisputed that, pursuant to Mods. 142, 144-145, 147-149, 152, 156, 159-160, 162-173, 175-176, 178-200, 202-205, BELL expressly reserved its right to maintain labor inefficiency claims, as well as claims for delay. See Ptf. App. at 77-127. BELL wants to make clear that in this litigation it is not asserting a claim for delay for the changes covered in Mods. 93-140. Rather, with respect to Mods. 93-140, BELL is seeking recovery based on their contribution to the overall labor inefficiency and cumulative impact that BELL suffered. BELL's claim for a time extension in this litigation, which is not the subject of the cross-motions, is based on the modifications for which it indisputably reserved its right to maintain claims based on delay, and not on Mods. 93-140.

order to determine whether there has been an accord and satisfaction. Id. at 92-93 (emphasis added). The Government has failed to meet its burden.

The record shows that there was no meeting of the minds regarding BELL's labor inefficiency and cumulative impact claims. It is undisputed that labor inefficiency and cumulative impact claims were not discussed during the parties negotiations of Mods. 93 and 94-140. See Affidavit of Jeremy Bardin, ¶¶ 36-37, Ptf. App. at 9; and Government's Summary of Negotiations, ¶ K, "Negotiations" (the parties negotiated "compensation . . . for the time impact of all changes issued on or before 8/31/00."), Ptf. App. at 66 (emphasis added).

Thus, before a dispute arose, the parties understood that their negotiations pertained to time impacts, not labor inefficiency and cumulative impact. See Sipco Services & Marine, Inc., 41 Fed. Cl. at 213 (contract must be interpreted by the understanding that the parties manifested before their dispute). Moreover, even after a dispute arose, the Government confirmed that Mod. 93 covered only delay claims. See Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 51, Lines 10-14, (Mod. 93 was "the mod. where we paid [BELL] for delays up to that date, and that was it . . ."), Ptf. App. 23 (emphasis added); and Government's Response to Interrogatory No. 5 ("Most important, bilateral modification number 93, issued in October 2000, expressly resolved claims by Bell BCI for all delays resulting from change orders transmitted on or before August 31, 2000."), Ptf. App. at 69 (emphasis added).

Neither the modifications themselves, nor the related summaries of negotiation that the Government included in its Appendix, make any reference to the resolution of labor inefficiency and cumulative impact claims. In short, there is no evidence demonstrating "the parties objective manifestations of intent . . . that they reached a meeting of the minds with the respect to

13

additional claims" involving labor inefficiency and cumulative impact. Jackson Construction Co., 62 Fed. Cl. at 93.

Stated differently, the parties could not and did not reach an agreement about labor inefficiency and cumulative impact claims, because those issues were not even discussed when the subject modifications were negotiated. For the same reason, BELL could not waive such claims when it agreed to the subject modifications. Cf., A Olympic Forwarder, Inc., 33 Fed. Cl. at 521 (in order to be valid, a waiver must be voluntary, knowing, and made intelligently with the intention to relinquish a right, privilege, advantage or benefit).

Furthermore, BELL submits that the plain language of Mod. 93 and Mods. 94-140 cannot be reasonably interpreted to include labor inefficiency and cumulative impact within their scope. As a matter of law, delay claims are separate and distinct from labor inefficiency and cumulative impact claims. See Sauer, Inc., 224 F.3d at 1348; and U. S. Industries, Inc., 671 F.2d at 546. The Government has conceded this point. See Daigle Dep. Tr. at p. 48, Line 7 – p. 49, Line 2, Ptf. App. 30-31. Consistent with the undisputed fact that labor inefficiency and/or cumulative impact claims were not part of the negotiations of Mod. 93 nor Mods. 94-140, there is no reference to such claims to in those modifications.

Contrary to the rules of contract interpretation, the Government stresses only one provision of the modifications and seeks to ignore the rest. For example, the Government emphasizes ¶ 8 of Mod. 93, yet ignores ¶ 4 and ¶ 5. As set forth above, ¶ 4 recited that the contract amount was increased as "full and equitable adjustment for all delays," and ¶ 5 states that Mod. 93 "incorporate[s] the time impact of any disputed changes issued on or before August 31, 2000."). See Mod. 93, ¶ 4 and ¶ 5, Ptf. App. at 63 (emphasis added). The language in ¶ 8 of Mod. 93 must be read in the context of, and is tempered by, these other provisions; it cannot be

14

considered in isolation. See Hol-Gar Mfg. Corp., 169 Ct.Cl. at 395, 351 F.2d at 979 (court

strives to give reasonable meaning to all parts of the contract).

The Government relies upon Atlantic Dry Dock Corp. v. United States, 773 F. Supp. 335,

336, 338-339 (M.D. Fla. 1991), to support its assertion that the release language in Mod. 93 and

Mods. 94-140 constitutes a release by BELL of a portion of its labor inefficiency and cumulative

impact claims. The Government's reliance on Atlantic Dry Dock Corp. is misplaced, however,

because the release language in that case expressly included not only all claims for delays, but

also all claims for "disruption." See Atlantic Dry Dock Corp., 773 F. Supp. at 336. In that case,

the court found that, because the release provision expressly addressed "delay and disruption,"

the plaintiff could not maintain its claims for cumulative delay and disruption. Id. at 338-

339(emphasis added). Conversely, there is no equivalent provision in Mods. 93-140 regarding

"disruption" claims such as labor inefficiency and cumulative impact.

Significantly, the Atlantic Dry Dock Corp. court also held that the release provision did

not bar the plaintiff's claim for cardinal change.[2] The court stated:

> **Unlike the delay and disruption claim, to which a specific clause of the release provision is directed, no part of the provision specifically addresses cardinal change. Thus, this Court cannot infer an intent to release the cardinal change claim from any direct reference to the release provision.**
>
> ***
>
> **In light of the legal principles governing cardinal change claims, and in light of the standard of ambiguity, the Court finds that the release provision is reasonably susceptible to more than one interpretation as applied to the cardinal change claim. Therefore, the provision is ambiguous as applied to that claim and may not be enforced as a matter of law to bar it.**

Atlantic Dry Dock Corp., 773 F. Supp. at 339 (emphasis added).

---

[2]    BELL has stated a claim for cardinal change in Count IV of the Complaint.

Just as the Atlantic Dry Dock Corp. court held that the it could not infer an intent to release claims that were not specifically addressed via a release, there is nothing in the subject modifications from which an intent by BELL to release a portion of its labor inefficiency and cumulative impact claims can be inferred.  Although BELL maintains that the Mod. 93 and Mods. 94-140 plainly do not include labor inefficiency and cumulative impact claims, in the alternative, BELL contends that the language in the modifications is ambiguous with regard to such claims.  BELL's interpretation that such claims are not included in those modifications is reasonable and the Government, as the drafter of the modifications, will have ambiguity construed against it.  Atlantic Dry Dock Corp., 773 F. Supp. at 339; and Firestone Tire & Rubber Co., 444 F.2d at 551.

In addition to failing to prove a meeting of the minds, the Government cannot establish that it provided BELL with any consideration for purportedly waiving a portion of its labor inefficiency and/or cumulative impact claims.  There is nothing in the record to support an assertion that the Government gave BELL any consideration for such claims.

With regard to Mod. 93 for example, the Government's summary of negotiations reflect only that the Government provided consideration for delay.  See Government's Summary of Negotiations, ¶ L ("A Delay Costs of $700,000 was added to this Modification in an effort to compensate the Contractor for any delay claims related to the deferred design Bulletins and all Government changes transmitted to the Contractor on or before August 31, 2000."), Ptf. App. at 66 (emphasis added).  Indeed, as noted above, the Government has characterized Mod. 93 as "the mod. where we paid [BELL] for delays up to that date, and that was it . . . They accepted that mod. as all of the delays up to that date, whatever was issued."  See Government's RCFC Rule 30(b)(6) Dep. Tr. at p. 51, Lines 10-14, Ptf. App. 23 (emphasis added).  Plainly, neither Mod. 93,

16

nor Mods. 94-140, gave BELL consideration for supposedly relinquishing a portion of its labor inefficiency and cumulative impact claims.

One of the cases relied upon by the Government, Chesapeake & Potomac Telephone Co. of Virginia v. United States, 228 Ct. Cl. 191, 654 F.2d 711 (1981), further demonstrates the Government's failure to establish accord and satisfaction. In that case the court stated that "[a]n 'accord' is 'an agreement by one party to give or perform, and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due.'" Id. at 716 (emphasis added) (citation omitted). BELL's labor inefficiency and cumulative impact claims were not matured as of the time that Mod. 93 and Mods. 94-140 were executed.[3] These claims, which necessarily matured after these modifications were entered into, reflected BELL's ability to perform the myriad of additional changes that the Government subsequently directed.

Based on the foregoing, as a matter of law, the doctrine of accord and satisfaction does not bar any portion of BELL's claims for labor inefficiency and cumulative impact. Accordingly, the Government's Motion should be denied and partial summary judgment should be entered in BELL's favor.

**B.   PARTIAL SUMMARY JUDGMENT SHOULD BE ENTERED IN BELL'S FAVOR HOLDING THAT THE GOVERNMENT HAS IMPROPERLY ASSESSED LIQUIDATED DAMAGES**

The Government bears the burden of going forward, as well as the ultimate burden of proof, with regard to establishing the propriety of its assessment of liquidated damages against BELL for purportedly not meeting the interim milestones set forth in Mod. 93. See PCL Construction Services, Inc., 53 Fed. Cl. at 484. The Government has failed to meet its burden,

---

[3]   It should be noted that various of these modifications contained partial deductions to BELL's scope of work.

17

however, because it has admitted that it has not performed the necessary analysis to justify its

assessment of liquidated damages.

In this litigation, the Government relies solely upon the testimony of one of its proposed

expert witnesses, Mr. Scott, to allocate all responsibility for delay as between BELL and the

Government, including the assessment of liquidated damages. See Government's RCFC Rule

30(b)(6) Dep. Tr. at p. 8, Lines 1-19, Ptf. App. 19. The Government, through Mr. Scott,

recognized that, in order to determine whether liquidated damages could properly be assessed for

BELL's allegedly failing to meet the interim milestones established by Mod. 93, it would be

necessary to analyze the effect that Government changes had on the work relating to each

individual milestone. See Scott Dep. Tr. at p. 77, Lines 1-14, Ptf. App. at pp. 28.

Mr. Scott, however, admitted that he did not perform any such analysis:

A.    I did not analyze each milestone. So I didn't come to an opinion as to what
the delays were for each interim milestone.

Q.    So if I understand your testimony, for each window you established, you did
not analyze the effect any change had during that window on each individual
milestone.

A.    That's correct.

***

Q.    Well, isn't it true that you would have to analyze the effect on each individual
milestone to determine whether or not the contractor [BELL] is due an
excusable delay for liquidated damages for that milestone?

A.    That's correct.

See Scott Dep. Tr. at p. 76, Line 20 – p. 77, Line 5 and Lines 9-14, Ptf. App. at 27-28.

Thus, by its own admission, the Government has not performed the necessary analysis to

support its assessment of liquidated damages. Accordingly, the Government cannot meet its

18

burden of proof, and summary judgment should be entered in BELL's favor with regard to the

Government's assessment of liquidated damages.

BELL is also constrained to point out that NIH, pursuant to its statutory reporting

obligations under the Government Performance and Results Act ("GPRA"), P.L. 103-62, 31

U.S.C. §§ 1115, et seq., has expressly represented to the Congress that the Building 50 Project

was completed "on schedule." See NIH GPRA Report, Ptf. App. at 17. That representation is

grossly at odds with the assessment of liquidated damages.

## V.    CONCLUSION

For the foregoing reasons, BELL respectfully moves the Court to:

1.    Deny the Government's Motion for Partial Summary in its entirety;[4]

2.    Grant BELL's Cross-Motion for Partial Summary Judgment in its entirety and hold that no portion of BELL's labor inefficiency and cumulative impact claims is barred or waived by the doctrine of accord and satisfaction, and that the Government may not assess liquidated damages against BELL; and

3.    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

BELL BCI COMPANY

By counsel,

/s/  Richard O. Wolf
Richard O. Wolf
Robert D. Windus
MOORE & LEE, LLP
1750 Tysons Boulevard, Suite 1450
McLean, Virginia  22102-4225
Telephone:  (703) 506-2050
Facsimile:  (703) 506-2051
Dated: July 15, 2005                E-mail: r.wolf@mooreandlee.com

---

[4]    As stated above, BELL stipulates to the dismissal of Count VI.

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of July, 2005, I caused a true and correct copy of the

foregoing to be served via the Court's ECF procedures on defendant's counsel:

> Kyle Chadwick
> Trial Attorney
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> Attn: Classification Unit
> 1100 L Street, N.W. 8[th] Floor
> Washington, D.C. 20530


                                        /s/   Richard O. Wolf
                                        Richard O. Wolf