**BROWER, KRIZ & STYNCHCOMB, LLC**
CONSULTANTS TO THE CONSTRUCTION INDUSTRY
1375 PICCARD DRIVE, SUITE 150
ROCKVILLE, MARYLAND 20850
301-977-8000

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISIONS AT GREENBELT

UNITED STATES OF AMERICA,
F/U/B STROMBERG METAL WORKS, INC.

PLAINTIFF,

CIVIL ACTION NO. L 02 CV 3188

v.

BELL BCI COMPANY AND
UNITED STATES FIDELITY AND GUARANTY
COMPANY,

DEFENDANTS.

_____/

# EXPERT REPORT

BY

**Barry A. Brower**
**BROWER, KRIZ & STYNCHCOMB, LLC**
Construction Consultants

PREPARED FOR

Huddles & Jones, P.C.
Attorneys for Stromberg Sheet Metal Works, Inc.

**NOVEMBER 17, 2003**

EXHIBIT
tabbies
12

## BROWER, KRIZ & STYNCHCOMB, LLC

**BROWER, KRIZ & STYNCHCOMB, LLC** was retained by Huddles & Jones, P.C., attorneys for Stromberg Sheet Metal Works, Inc. ("Stromberg") to perform a scheduling and damage analysis concerning the construction of Building #50 at the National Institute of Health in Bethesda, Maryland ("the Project"). In particular, we were asked to review the impacts resulting from delays to Stromberg's performance, the impact of the changes to the Project, and losses of labor and equipment productivity that may have been sustained by Stromberg in the performance of its work. The following report describes, in general, our findings and opinions on the issues that we were asked to review.[1] A copy of our qualifications and experience is attached at **Exhibit 1.**

### SUMMARY OF FINDINGS AND CONCLUSIONS

Based on our review and analysis, we have concluded the following:

- **Due to the addition of the 4ᵗʰ Level and associated additional scope, additional change orders and other impacts, Stromberg could not achieve substantial completion of its work until on or about April 30, 2001, a delay of 305 calendar days from the project's adjusted completion date of June 29, 2000.**

- **As a result of the impacts and delays beyond its control, Stromberg was entitled to a compensable extension of time of 305 calendar days. As a result of this delay, Stromberg is entitled to recover $284,010 in extended field overhead costs.**

- **As a result of the impacts and changes to its scope of work, Stromberg sustained a loss of labor productivity totaling $944,789.**

---

[1]    As set forth in **Exhibit 2,** we have reviewed certain documents pertaining to the Project, and have spoken with several Stromberg personnel. Since our analysis is based on the data that we have reviewed as well as the limitations set forth herein, we reserve the right to amend, modify or supplement this report based upon further discovery and investigation.

**BROWER, KRIZ & STYNCHCOMB, LLC**

# I    INTRODUCTION

## 1.    GENERAL BACKGROUND

The Project involved the construction of the Consolidated Laboratory Facility – Building 50 for the National Institute of Health ("NIH") in Bethesda.  Bell BCI Company ("Bell") entered into a prime contract with the NIH Acquisitions Branch ("Owner") for the construction of the Project.  Bell entered into a subcontract agreement dated April 24, 1998 with Stromberg in the amount of $3,670,000 wherein Stromberg was to furnish and install the sheet metal work required for the construction of the Project, including all ductwork, sound attenuators, diffusers, registers and dampers, along with the installation of the terminal units, fans, VAV boxes, static pressure and air flow control stations, and air curtains. A multitude of changes issued to Stromberg during the course of the Project increased Stromberg's original subcontract amount by nearly 70%.

The original planned completion date for Stromberg's work was September 30, 1999.  However, pursuant to Subcontract Change Order No. 1, the completion date for Stromberg's work was extended to December 31, 1999[2].  Given the contractual duration of 821 calendar days and an April 1, 1998 Notice to Proceed ("NTP"), the overall Project was to be completed by June 29, 2000.

## 2.    DETAILS AS TO CONSTRUCTION

The Project, commonly known as "Building 50", originally consisted of a basement level, five floors and a penthouse.   The major construction activities consisted of excavation and backfill, site utilities, the installation and placement of a slab-on-grade ("SOG"), the construction of reinforced concrete walls and columns, structural steel, concrete slabs poured on metal deck, roofing, curtainwall and interior finishes. Stromberg's major scope of work consisted of the submittal and fabrication of sound attenuators, submittal, fabrication and installation of the HVAC ductwork, and installation of VAV boxes.  During the course of the Project an additional level, the 4th floor, was added, thereby increasing the size of the structure from six to seven occupied levels.

---

[2]        For the Rough-in of the ductwork

## BROWER, KRIZ & STYNCHCOMB, LLC



March 31, 2000: *the exterior of the Building 50.*

### 3.  SCHEDULING OF THE PROJECT AND DELAYS IN OVERALL PROJECT COMPLETION

Bell was responsible for the overall scheduling of the Project. Bell's initial critical path method ("CPM") schedule entitled NHR6 with a data date of April 1, 1998 ("the Project Baseline Schedule") established a Project substantial completion date of June 29, 2000. The only Stromberg work that was on Bell's critical path of the Project Baseline Schedule was Activity A000011210, "Trim-Out Ductwork" that was restrained by the completion of the fume hood installation, an activity that was not part of Stromberg's scope.[3]  The remaining activities for Stromberg's work showed positive float in the Baseline Schedule. There is no allegation that Stromberg caused or contributed to any delays in the completion of the Project.

In subsequent CPM updates, Bell's schedules revealed the following changes in the overall Project completion date that resulted in a net slippage of 306 calendar days from the June 29, 2000 completion date in the Project Baseline Schedule:

---

[3]      A review of Bell's monthly CPM schedule updates beginning with NH14 with data date of August 1, 1999 through NA28 with a data date of October 1, 2000 show that none of Stromberg's work activities drove the critical path of the Project. Following these updates, the Project was driven by delays associated with the 4th floor addition.

## BROWER, KRIZ & STYNCHCOMB, LLC

**NH11 (DD: May 2, 1999):**       **July 29, 2000 completion date, 30 calendar day slippage from Baseline Schedule**

**N222 (DD: October 31, 1999):**    **August 28, 2000 completion date, 60 calendar day slippage from Baseline Schedule**

**N126 (DD: August 1, 2000):**     **August 28, 2000 completion date, 60 calendar day slippage from Baseline Schedule**

**N127 (DD: September 1, 2000): May 1, 2001 completion date, 306 calendar day slippage from Baseline Schedule**

Bell submitted a Request for Equitable Adjustment to NIH dated April 5, 2002 ("the Bell REA") detailing the reasons why the Project was delayed, including the addition of the 4th Level and a multitude of other change orders. As noted in the Bell REA, the 4th Level was not simply a duplication of the prior levels, but involved substantial revised designs that NIH failed to provide in a timely manner.[4] On October 2, 2000, Bell and NIH entered into Modification #93, which granted Bell an extension of 305 calendar days or a substantial completion date of April 30, 2001.[5]

The Bell April 5, 2002 REA requested an additional 245 calendar day extension of time beyond the adjusted substantial completion date of April 30, 2001[6] as a result of "hundreds of changes that the Government issued to Bell subsequent to the Modification 93 Agreement." Bell contended that its performance had been extended to December 31, 2001 for the completion of the original contract work, with additional change order work being performed through February 5, 2002.   We have relied upon the Bell REA analysis with respect to overall Project delays.

For purposes of computing compensable delay, Stromberg advised BKSLLC that they substantially completed their base contract work on or about April 30, 2001 and the only work performed thereafter was change order work that was either paid or is the subject of a disputed change order.   Thus, since all of the work, with the exception of

---

[4]    Bell REA, p. 2-3
[5]    Modification #93 added a series of 14 milestone dates, with the last floor to be completed being the first floor on April 15, 2001.  The first floor was followed by the completion of the landscape on April 30, 2001.
[6]    Contract Modification #93 extended the Project substantial completion date to April 30, 2001

## BROWER, KRIZ & STYNCHCOMB, LLC

change order work, was substantially completed on April 30, 2001, we have utilized that date as the date of Stromberg's substantial completion.  Accordingly, based on Bell's Project Baseline Schedule that forecast a June 29, 2000 substantial completion date, Stromberg's performance was delayed 305 calendar days due to causes beyond its control.  BKS did not see any alleged concurrent delay on the part of Stromberg in performing our analysis.

BROWER, KRIZ & STYNCHCOMB, LLC

## II.    IMPACTS TO STROMBERG'S WORK DUE TO CHANGES

### 1.    IMPACTS DUE TO CHANGED WORK

During the course of the Project Stromberg's work was impacted as a result of numerous changes to its initial scope.  In addition to the major addition of the 4th floor, late design revisions from the Owner resulted in impacts to Stromberg's work.  This required Stromberg to repeatedly remove their installed work as the drawings were repeatedly redesigned. Reinstallation of the change work then had to be performed in extremely congested work spaces, out of sequence, and in an unproductive and inefficient fashion. These changes impacted Stromberg's work on all levels of the building.  For purposes of illustration in this Report (and in the accompanying PowerPoint presentation) we will detail the impact of these changes to the original Contract coordinated drawings ("OCCD") and to each of the subsequent revisions on the Basement, First, Second and Sixth levels, as reflected in the following diagrams.  These charts formulate the basis for the lost efficiency.

**BASEMENT LEVEL CHANGES, AREA C**



## BROWER, KRIZ & STYNCHCOMB, LLC

The ductwork at this Basement location was modified on or about November 17, 1999 which reflected a significantly different scope of work, as follows:





However, the November 17, 1999 modifications were subsequently modified in a revised design that was issued on or about May 17, 2001. The following diagram shows the dramatic difference between the two installations. Stromberg had to replace

### BROWER, KRIZ & STYNCHCOMB, LLC

ductwork that was already installed in order to install the ductwork in accordance with the revised design.





## BROWER, KRIZ & STYNCHCOMB, LLC

### BASEMENT LEVEL CHANGES, AREA D

Changes also impacted Stromberg's duct installation in Area D of the Basement Level, as shown in the following diagrams:



On or about April 1, 1999, the ductwork at Area D of the Basement Level was significantly revised, as set forth in the following diagram:



## BROWER, KRIZ & STYNCHCOMB, LLC

The following diagram illustrates the dramatic difference between the OCCD drawings and what was installed per the April 1, 1999 revisions:



However, once Stromberg had completed the revised installation, the Owner again changed the ductwork in this area on or about May 7, 2001 in a revised design:



**BROWER, KRIZ & STYNCHCOMB, LLC**

The following diagrams illustrate the substantial difference in the scope of work. Again, Stromberg had to remove previously installed ductwork in order to accommodate the revised design.





# BROWER, KRIZ & STYNCHCOMB, LLC



*March 31, 2000:  the contract ductwork is complete, however Change Order work is pending.*

## BROWER, KRIZ & STYNCHCOMB, LLC



*March 31, 2000:  Basement ductwork installation, prior to May 2001 changes. Ductwork removed to permit access for change work.*

## BROWER, KRIZ & STYNCHCOMB, LLC

### LEVEL ONE DUCTWORK CHANGES



The Level One ductwork was originally revised in Revision 4, as follows:



## BROWER, KRIZ & STYNCHCOMB, LLC

The following diagram illustrates the dramatic difference:



Again, Stromberg was required to remove previously-installed ductwork in order to comply with the revised design.  However, the Level One ductwork was again redesigned in Revision 9, as follows:



## BROWER, KRIZ & STYNCHCOMB, LLC

Again, Stromberg's scope was altered, requiring reinstallation of the revised ductwork from Revision 4, as follows:



However, Revisions 4 and 9 were not the final design revisions to the Level One ductwork.    On July 31, 2001, final revisions were made to Level One ductwork, as follows, requiring additional reinstallation by Stromberg after the Revision 9 work was complete:



**BROWER, KRIZ & STYNCHCOMB, LLC**



The following diagram demonstrates that the Level One ductwork as built was dramatically different from the OCCD drawings:



### BROWER, KRIZ & STYNCHCOMB, LLC



*May 10, 1999: The 1ˢᵗ Floor Interstitial ductwork mains are installed.*



*August 2 1999: 1ˢᵗ Floor duct rough-in work is substantially completed. the congestion of the area and lack of access to the duct for future changes issued in July 2001 is clearly shown in the interstitial space above the metal deck.*

## BROWER, KRIZ & STYNCHCOMB, LLC

### LEVEL TWO DUCTWORK CHANGES



The ductwork on Level Two was revised from the original design in Revision 6, as follows:



BROWER, KRIZ & STYNCHCOMB, LLC



In Revision 10, Stromberg was required to once again revise the Level Two ductwork, as follows:



BROWER, KRIZ & STYNCHCOMB, LLC



However, Revision 10 was not the final revision to the Level Two ductwork.  On November 19, 1999, the Owner issued the following final revisions that required a new duct installation by Stromberg:



BROWER, KRIZ & STYNCHCOMB, LLC



As the following diagram illustrates, the final product was dramatically different from the OCCD drawings.



## BROWER, KRIZ & STYNCHCOMB, LLC



*December 30, 1999: 2nd floor interstitial ductwork work complete, prior to the January 2001 changes.*



*March 31, 2000: 2nd floor interstitial, ductwork and Change Order work is complete prior to the January 2001 changes.*

BROWER, KRIZ & STYNCHCOMB, LLC

## LEVEL SIX AREA B (Location 1) DUCTWORK CHANGES



On April 17, 2000, the Owner revised the Level Six ductwork requiring Stromberg to reinstall the work in accordance with the revised design, as follows:



## BROWER, KRIZ & STYNCHCOMB, LLC



## 6th Level Ductwork Changes (Location 2) Area B

Stromberg also encountered multiple changes and reinstallation of its ductwork in the following area of Level Six:



## BROWER, KRIZ & STYNCHCOMB, LLC

On or about April 17, 2000, the Owner revised the ductwork at this location, resulting in changed work as follows:





## BROWER, KRIZ & STYNCHCOMB, LLC



*March 31, 2000: 6th floor interstitial ductwork awaiting changes to facilitate completion.*

The above impacts and delays resulted in a loss of labor productivity to Stromberg for, among other things, the following:

- Stromberg had to divert supervision to address the changed conditions.

- Stromberg had to reinstall ductwork (on multiple occasions and in multiple areas) that had been previously installed.

- Stromberg was required to work around other trades, out of sequence, often in physically limited and congested work areas.

## BROWER, KRIZ & STYNCHCOMB, LLC

# IV.  DAMAGES SUSTAINED BY STROMBERG

Based on our review and analysis, we have determined that Stromberg sustained the following categories of damages, exclusive of contract balance, disputed change orders, interest, and expenses of litigation:

### 1.  Extended Field Overhead - $ 284,010

As a result of the extended duration of the Project based on Bell's own REA analysis of Project delay through April 30, 2001, Stromberg incurred additional field overhead expenses.  As of that date, Stromberg had completed its base contract work although change order work was performed after April 30, 2001.  No extended field overhead is being claimed for the work performed after April 30, 2001.  The extended field overhead was calculated as follows:

| EXTENDED FIELD OVERHEAD | |
|---|---|
| **General Conditions** | **Amount** |
| Direct Overhead | $396,052.00 |
| G&A | $94,087.00 |
| Indirect Overhead | $442,735.00 |
| **TOTAL FIELD OVERHEAD** | **$932,874.00** |
| **Less Change Order Overhead** | **$159,640.00** |
| **Start of Contract** | 4/24/1998 |
| **Substantial Completion** | 4/30/2001 |
| **Total Duration** | **1,102 Calendar Days** |
| **TOTAL DAILY OVERHEAD RATE** | 846.53 |
| **TOTAL DAILY OVERHEAD RATE w/PROFIT (10%)** | 931.18 |
| **Original Completion Date** | 6/29/2000 |
| **Actual Substantial Completion Date** | 4/30/2001 |
| **TOTAL DAYS OF DELAY** | 305 |
| **TOTAL EXTENDED FIELD OVERHEAD** (Total Daily Rate x Days of Delay) | **$284,010** |

## BROWER, KRIZ & STYNCHCOMB, LLC

### 2.    Loss of Labor Productivity - $959,848

Stromberg coded its labor costs by type of work as well as area of the Project. Thus, Stromberg's actual production rates could be measured both by time period and by area of the Project in terms of manhours and pounds of sheet metal installed as compared to their planned production.   Since Stromberg's records enabled us to determine what work was being performed, we were able to determine Stromberg's productivity on a per floor basis.   A per floor basis allowed us to obtain an accurate measure of Stromberg's productivity using actual data that is superior to reliance upon any industry standard.

As per Stromberg's December 19, 2001 claims submission, we also allocated the impacted labor hours at 90%.  This conservative approach removes from question any arguments concerning alleged inefficiencies that may be attributable to Stromberg, to the extant they may exist.

Based on our analysis, we concluded that Stromberg sustained a loss of labor productivity on the Project.  This amount totals $959,848 as explained below.   This amount was determined utilizing a "modified total cost" approach.[7]   In determining Stromberg's losses of productivity, we utilized three damage "models":

**MODEL #1: TOTAL COST APPROACH:**    This approach compared Stromberg's estimated craft labor hours with its actual craft labor hours through August 31, 2000. This analysis indicated a loss of productivity of $1,119,905.

---

[7]    Another method for calculating losses of productivity is the "measured mile" method where a contractor's productivity during an impacted period of work on the Project is compared with an unimpacted period of work on the Project. However, since all of the floors of the building were impacted and delayed, we could not determine a realistic measured mile to use as the basis to determine planned productivity.

## BROWER, KRIZ & STYNCHCOMB, LLC

| MODEL #1 | |
|---|---|
| LOST HRS (8/31/00) TOTAL APPRCH | |
| Total Actual Hours | 91,669 |
| Actual Hours (8/31/00) | 77,361 |
| PCT Complete (8/31/00) | 84% |
| Total Planned | 38,809 |
| PCT Planned Complete | 32,752 |
| CO HRS - 8/31/00 (82%) | 18,740 |
| **Lost Hours** | **25,870** |
| Rate | $ 43.29 |
| **LOST DOLLARS** | $ **1,119,905** |

**MODEL #2: MODIFIED TOTAL COST APPROACH ON A PER FLOOR BASIS**: This approach analyzed Stromberg's production through August 31, 2000 on a per floor basis, including change orders, with the exception of the 4th Level.   This analysis indicated a loss of productivity of $916,828.

| Floor | Hours Worked (8/31/00) | (Plus) Allocated Hours | Gross Actual Hours Worked (8/31/00) | CO Hrs (8/31/00) | Actual Poundage Installed | lbs/hr (8/31/00) | % Prod | Prod Hrs | Lost Hours | Allocated Labor Impacted (90%) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | 11,869 | 2,425 | 14,294 | 3,649 | 90,063 | 6.30 | 44% | 6,326 | 7,969 | 7,172 | |
| 1st Floor | 6,794 | 1,388 | 8,182 | 1,785 | 48,976 | 5.99 | 62% | 5,056 | 3,126 | 2,813 | |
| 2nd Floor | 6,965 | 1,423 | 8,387 | 1,149 | 47,383 | 5.65 | 71% | 5,921 | 2,467 | 2,220 | |
| 3rd Floor | 7,618 | 1,556 | 9,174 | 1,592 | 49,006 | 5.34 | 57% | 5,238 | 3,936 | 3,542 | |
| 4th Floor | 6,105 | 1,247 | 7,352 | 10,588 | 82,869 | 11.28 | | - | - | | |
| 5th Floor | 6,058 | 1,238 | 7,296 | 1,694 | 49,000 | 6.72 | 72% | 5,220 | 2,075 | 1,868 | |
| 6th Floor | 5,025 | 1,027 | 6,052 | 2,313 | 49,012 | 8.10 | 90% | 5,435 | 617 | 555 | |
| Penthouse | 13,804 | 2,820 | 16,624 | 84 | 205,628 | 12.37 | 80% | 13,281 | 3,343 | 3,009 | |
| **TOTAL HOURS** | 64,237 | 13,124 | 77,361 | 22,853 | 621,967 | 8.04 | | 46,477 | 23,532 | 21,179 | Total Lost Hrs |
| | | | | | | | | | | $ 43.29 | Unit Rate / hr |
| | | | | | | | | | | $ 916,828 | TOTAL |

## BROWER, KRIZ & STYNCHCOMB, LLC

**MODEL #3: MODIFIED TOTAL COST APPROACH ON A PER FLOOR BASIS EXCLUDING CHANGE ORDERS:** This approach analyzed Stromberg's production through August 31, 2000 on a per floor basis, excluding change orders, as well as weather impacts to Stromberg's production on the Penthouse level. This analysis indicated a loss of productivity of $944,789.

| Floor | Hours Worked (8/31/00) | (Plus) Allocated Hours | Gross Actual Hours Worked (8/31/00) | CO Hrs (8/31/00) | 82% CO HRS | Net Corrected Total Actual Base Hours | Actual Poundage Installed | CO Pounds (8/31/00) | Adj LBS (8/31/00) | lbs/hr (8/31/00) | % Prod | Prod Hrs | Lost Hours | Allocated Labor Impacted (90%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | 11,869 | 2,425 | 14,294 | 3,649 | 2,982 | 11,302 | 90,063 | 20,275 | 69,787 | 6.17 | 43% | 6,199 | 8,095 | 7,295 |
| 1st Floor | 6,794 | 1,388 | 8,182 | 1,785 | 1,463 | 6,719 | 48,976 | 9,893 | 39,083 | 5.82 | 60% | 4,914 | 3,268 | 2,942 |
| 2nd Floor | 6,965 | 1,423 | 8,387 | 1,149 | 942 | 7,446 | 47,383 | 8,844 | 38,539 | 5.18 | 65% | 5,425 | 2,962 | 2,666 |
| 3rd Floor | 7,618 | 1,556 | 9,174 | 1,592 | 1,306 | 7,868 | 49,006 | 14,016 | 34,990 | 4.45 | 48% | 4,361 | 4,813 | 4,332 |
| 4th Floor | 6,105 | 1,247 | 7,352 | 10,588 | 8,682 | (1,330) | 82,899 | 82,899 | 82,899 | | | | – | |
| 5th Floor | 6,058 | 1,238 | 7,296 | 1,694 | 1,389 | 5,907 | 49,000 | 18,004 | 30,996 | 5.25 | 56% | 4,070 | 3,217 | 2,895 |
| 6th Floor | 5,025 | 1,027 | 6,052 | 2,313 | 1,897 | 4,155 | 49,012 | 16,833 | 32,179 | 7.74 | 86% | 5,197 | 855 | 769 |
| Penthouse | 13,804 | 2,820 | 16,624 | 84 | 69 | 14,093 | 205,628 | 1,064 | 204,584 | 14.52 | 94% | 15,585 | 1,039 | 935 |
| TOTAL HOURS | 64,237 | 13,124 | 77,361 | 22,853 | 18,740 | 58,621 | 621,967 | 171,830 | 450,137 | 7.68 | | | 45,769 | 24,280 | 21,825 |

21,825 Total Lost Hrs
43.29 Unit Rate / hr
$ 944,789 TOTAL



*December 30, 1999: Penthouse ductwork being installed in open, unconditioned areas.*



*December 30, 1999: Ice forming on the penthouse floors due to the building not being weathertight.*

It is our opinion that **Model #3** best represents the actual loss incurred by Stromberg. **Model #3** utilized Stromberg's actual craft manhours worked on a per floor basis through August 31, 2000, as well as allocating hours which were performed on all of the floors (such as cleanup to each floor on a pro rata basis). In addition, we determined the total change order manhours worked by Stromberg on a per floor basis. The change order manhours were adjusted to 82% of their total, due to certain pricing adjustments in the change order estimate. The adjusted change order hours were then subtracted from the total manhours to determine an adjusted total base contract manhours on a per floor basis. The 4th floor was included in this analysis and resulted in a 1,330 manhour deduction to the total manhours due to the fact that Stromberg was more productive performing the change order work than the base contract work. We adjusted the actual manhours for the Penthouse to deduct 2,462 manhours that were the result of reduced productivity working in winter weather from December 1, 1999 through March 15, 2000.[8]

---

[8]    Stromberg worked 4,924 manhours on the Penthouse from December 1, 1999 through March 15, 2000. Based on the industry standards set forth in the *Constructor Magazine* study, Stromberg sustained a loss of 50%

## BROWER, KRIZ & STYNCHCOMB, LLC

We then determined the number of pounds of sheet metal installed by Stromberg on a per floor basis and deducted the change order pounds. We then compared the pounds per hour on a per floor basis with the pounds per hour estimated for that floor to determine the loss of productivity on that floor. As per Stromberg's December 19, 2001 claims submission, we also allocated the impacted labor hours at 90%. This conservative approach removes from question any arguments concerning alleged inefficiencies that may be attributable to Stromberg, to the extant they may exist.

**Model #3** is, in our opinion, the most reliable available estimate of Stromberg's loss of labor productivity. **Model #2** did not adjust for the change order hours. **Model #3** excludes the impact of the change order work, where Stromberg should, and in actuality incurred greater productivity. In addition, **Model #3** adjusted for the weather impact on the Penthouse work. Thus, it is our opinion that **Model #3** is the best estimate of Stromberg's loss of labor productivity.

---

productivity due to the winter conditions during that period. Therefore, we deducted 2,462 manhours from the total manhours expended for the Penthouse level.

## BROWER, KRIZ & STYNCHCOMB, LLC

# V    CONCLUSION

Based on our analysis, Stromberg's performance was delayed at least 305 calendar days due to causes beyond its control that constituted a compensable delay, resulting in increased field overhead costs of $284,010.   In addition, due to changes and other impacts during the course of the work, Stromberg sustained a loss of labor productivity that we have calculated at $944,789, a total REA of $1,228,799.

.

# BROWER, KRIZ & STYNCHCOMB, LLC

## EXHIBIT 1 – QUALIFICATIONS AND EXPERIENCE

### Barry A. Brower

Mr. Brower is a principal in the firm of BROWER, KRIZ & STYNCHCOMB, LLC. He has been engaged as an independent construction consultant since 1977, when he founded and served as President of Brower and Associates, Inc. Prior to 1977, he served the construction industry as a Project Engineer and Project Manager for such notable firms as Gordon H. Ball, Inc. (Dillingham Corporation) and the George Hyman Construction Company in heavy and high-rise construction.

Mr. Brower received a Bachelor of Science degree in Civil Engineering from Newark College of Engineering in 1971 and a Masters of Engineering Management degree from The George Washington University in 1977. In addition, he has taken graduate studies in management and accounting at the Bernard M. Baruch College of the City University of New York and American University in Washington, DC.

Mr. Brower is a recognized expert in CPM scheduling, construction cost analysis, financial analysis and construction management. He has been qualified as an expert witness by the American Arbitration Association, federal and state courts, and boards of contract appeals. A specific area of his expertise includes the facets of monetary evaluation in construction projects. He has been asked to speak to various professional organizations in his areas of expertise. Mr. Brower teaches courses in company valuations, accounting, and management at The George Washington University for the School of Engineering and Applied Science, Department of Engineering Management.

# BROWER, KRIZ & STYNCHCOMB, LLC

### Professional Experience

July 1999 -
**Present**

BROWER, KRIZ & STYNCHCOMB, LLC
Rockville, Maryland
Principal

Mr. Brower is actively involved in all aspects of construction consulting including scheduling, claims analysis, productivity and cost analysis, cost accounting, estimating, and educational seminars. Mr. Brower represents contractors, owners, design professionals, sureties, and bonding companies on a broad range of construction projects. Mr. Brower has been qualified as an expert in the area of construction schedule, cost and productivity analysis.

1977-1999

Brower & Associates, Inc.
Rockville, Maryland
President

Mr. Brower was actively involved in all aspects of construction consulting including scheduling, claims analysis, productivity and cost analysis, cost accounting, estimating, and educational seminars. Mr. Brower represented contractors, owners, design professionals, sureties, and bonding companies on a broad range of construction projects. Mr. Brower has been qualified as an expert in the area of construction schedule, cost and productivity analysis.

1990 -
Present
(Part-Time)

George Washington University
Associate Professor/Lecturer
Engineering Administration/Graduate Division

Courses encompass company valuation, accounting methods, financial statements, management and marketing. The specific courses of study qualified to teach are as follows:

Survey of Finance and Engineering Economics
Survey of material from accounting, finance and economics relevancy to engineering activity. Fundamentals of accounting and financial planning, budgeting and estimating.

Economic Analysis in Engineering Planning
Capital budgeting, price systems.

37

## BROWER, KRIZ & STYNCHCOMB, LLC

### Professional Experience (continued)

Finance for Engineers
Analysis and concepts useful to engineers. Sources and uses of funds, management of working capital, forecasting.

Introduction to Management of Construction
Finance and cost accounting for construction, labor management, construction management, project planning.

Construction Project Management
Subcontract relations, control, attention to delays.

Construction Cost Management
Estimating and control through construction activity, quantity and cost control.

Technical Enterprises
Technical based companies from entrepreneurship point of view.

Management for Engineers
Management as applied within the technical organization, case studies, enhanced understanding of external and internal factors influencing performance.

1977-1978       George Hyman Construction Company
Bethesda, Maryland
Project Manager - High-rise Construction

Responsible for manpower, costs, equipment, change orders, and general coordination of high-rise construction. Initiated and maintained CPM scheduling.

1974-1977       Gordon H. Ball, Inc.
Danville, California
Project Engineer - Metro Construction

Responsible for documentation, analyzation, preparation, and negotiation of change orders. Set up and maintained CPM project schedule. Maintained cost records and equipment records. Prepared forecasts and payment applications.

# BROWER, KRIZ & STYNCHCOMB, LLC

## Professional Experience (continued)

| | |
|---|---|
| 1971-1974 | Maccaferri Gabions, Inc.<br>New York, New York<br>Technical Director - Soils Stabilization Construction |

Responsible for sales, estimating, and construction of hydraulic structures.

| | |
|---|---|
| 1970 | New Jersey Department of Transportation<br>Teaneck, New Jersey<br>Field Engineer - Highway Construction |

Responsible for inspection of highway design projects and for all phases of maintaining quantitative data.

## Education

1992-1993    American University, Washington, DC
Several courses in Financial and Managerial Accounting

1976-1977    M.E.MT. (Masters of Engineering Management)
George Washington University, Washington, DC
Major:  Construction Management
Courses of Study: Critical path scheduling, estimating and bidding, contracts, contract administration, law for engineers, managerial accounting

1971-1973    Bernard M. Baruch College, City University of N.Y.
Several courses in management and accounting

1967-1971    B.S.C.E. (Bachelor of Science in Civil Engineering),
Newark College of Engineering, Newark, New Jersey
Major:  Highway Engineering

# BROWER, KRIZ & STYNCHCOMB, LLC

## Arbitrations & Alternate Disputes Resolution

Mr. Brower has served as a member of the American Arbitration Association (AAA) Panel of Arbitrators and participates in Alternate Disputes Resolution (ADR).

## Expert Testimony

Mr. Brower has been qualified as an expert in CPM scheduling / delay analysis, cost analysis, and construction management and has testified as an expert witness in several forums including Arbitrations, Boards, and Courts.

## Speaking Engagements

DC Chapter of the Society of CPA's, Washington, DC

Gordon H. Ball, Inc., San Francisco, California

Arthur Andersen Company, Washington, DC

Atlas Railroad Construction Company

American Society of Professional Estimators, Atlantic City, New Jersey

International Society of Cost Engineers, London, England

John Driggs Company, Inc., Maryland

Atlas Railroad Construction Company's 30th Anniversary Management Seminar, Williamsburg, Virginia

Mechanical Constructors, Inc., Springfield, Virginia

Rentenbach Engineers, Inc./Engineers-Constructors, Inc., Knoxville, Tennessee

Anjo Construction Company, Pittsburgh, Pennsylvania

American Association of Cost Engineers Symposium, Atlanta, Georgia

40

# BROWER, KRIZ & STYNCHCOMB, LLC
## CONSULTANTS TO THE CONSTRUCTION INDUSTRY

## Speaking Engagements (continued)

Electrical Maintenance Corporation, Rockville, Maryland

Ficon - Electrical Companies, Boulder, Colorado

U.S. Army Corps of Engineers, Radford, Virginia

J.A. Jones Construction Company, Chicago, Illinois

Northern Electrical Contractors, Golden, Colorado

Suburban Contractors, Falls Church, Virginia

E.E. Murry, Lancaster, Pennsylvania

U.S. Army Corps of Engineers, Fort Meade, Maryland

E.A. Baker Company, Inc., Takoma Park, Maryland

Korndoerfer Corporation, Sturtevant, Wisconsin

Federal Triangle Partnership & Mendelson, Associates Partnership,
Washington, DC

**BROWER, KRIZ & STYNCHCOMB, LLC**

CONSTRUCTION CONSULTANTS

# Exhibit 2

## INTERVIEWS CONDUCTED, DOCUMENTS REVIEWED AND LIMITING ASSUMPTIONS

We have reviewed the following documentation:

- Subcontract between Bell and Stromberg, including change orders
- Stromberg's preliminary claim submission date May 15, 2001.
- Stromberg's final claim submission dated December 19, 2001
- Correspondence
- Certain drawings and specifications
- meeting minutes
- the Bell REA and accompanying backup materials
- Transmittals and other communications between the parties regarding the Project
- Schedules prepared regarding the Project
- Daily Reports
- Photographs
- RFI's and Change Orders

In addition to the foregoing documents, we conducted interviews with Rick Freeman, Stromberg's Vice President, Bill Engle, the Project Manager, Jimmy Taggert, the Chief Estimator and Dave Fitzgerald, an Administrator.

As set forth at the outset of this report, our conclusions are based on the discovery and investigation that has been taken to date and, based on further discovery and investigation, we reserve the right to modify or change the findings and conclusions in this report.