# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*for the use and benefit of*<br>**STROMBERG METAL WORKS, INC.**<br><br>PLAINTIFF,<br><br>v.<br><br>**BELL BCI COMPANY and UNITED STATES**<br>**FIDELITY & GUARANTY COMPANY,**<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 1:02-cv-3188-BEL**<br>)<br>)<br>)<br>)<br>)<br>) |

## BELL BCI COMPANY'S OPPOSITION TO
## PLAINTIFF'S MOTION TO REOPEN CASE AND LIFT STAY

Pursuant to Local Rule 105, BELL BCI Company ("BELL") respectfully submits this Opposition to the Motion to Reopen Case and Lift Stay filed by Stromberg Metal Works, Inc. ("Stromberg") ("Stromberg's Motion").[1]

## I.     BELL'S REQUEST FOR EVIDENTIARY HEARING

Stromberg's Memorandum contains a number of assertions by Stromberg's lawyers about BELL's conduct that are false. BELL does not use the term "false" cavalierly, nor as hyperbole. The written record prepared previously by Stromberg's lawyers shows, unequivocally, that they know that assertions they made about BELL are, in fact, false. Despite this, Stromberg's lawyers have accused BELL of perpetrating a fraud on this Court. Given these troubling circumstances, BELL respectfully requests the Court to conduct an evidentiary hearing so that the appropriate persons may be placed under oath and, subject to cross-examination, explain their conduct.

---

[1]     United States Fidelity & Guaranty Company has filed an Opposition to Stromberg's Motion.

## II.    **SUMMARY**

BELL was the general contractor on a project for the United States (the "Government") for the construction of a laboratory research building located at the National Institutes of Health's ("NIH") Bethesda, Maryland campus (hereafter referred to as the "Project"). Stromberg was a subcontractor to BELL on the Project. United States Fidelity & Guaranty Company ("USF&G") issued a surety payment bond for the Project. Work on the Project started in 1998, and completed in 2002. A number of disputes arose on the Project due to changes made by the Government.

On April 5, 2002, BELL submitted a Request for Equitable Adjustment ("BELL's REA") to the Government for damages it incurred due actions by the Government. Stromberg prepared its own claim for delay and impact damages that it claimed to have incurred. On April 5, 2002, BELL passed through Stromberg's claims to the Government as a separate REA. On July 1, 2002, the Government's Contracting Officer denied BELL's REA. At that time, the Government's Contracting Officer also denied Stromberg's claims. Thereafter, in accordance with the Contracts Disputes Act, BELL filed a lawsuit against the Government in the United States Court of Federal Claims (the "Claims Court") seeking, *inter alia*, review of the Contracting Officer's denial of BELL's REA, as well as review of the denial of Stromberg's claims for delay and impact (hereafter referred to as the "Government Litigation").

On September 30, 2002, Stromberg filed its Complaint in this action against BELL and USF&G alleging breach of contract and breach of the payment bond. Stromberg asserted alleged damages claim to $1,295,616.00.[2]

---

[2]    This amount was set forth in Stromberg's Supplemental Answers to Interrogatories, a copy of which was appended as Exhibit 6 to Stromberg's Memorandum in Support of its Motion ("Stromberg's Memorandum").

On January 22, 2004, Stromberg, BELL and USF&G entered into a written agreement that settled certain of Stromberg's claims in this action (hereafter referred to as the "Partial Settlement Agreement"). A copy of the Partial Settlement Agreement is attached as Exhibit ("Exh.") 1.**[3]** Specifically, all of Stromberg's "claims for contract balance and extra work" were fully settled. *See* Exh. 1, Partial Settlement Agreement, ¶ 1. As a result, Stromberg expressly agreed that:

> **The only damages claim remaining in [this] action against BELL and USF&G is Stromberg's claim for $1,228,799.00, based on alleged field overhead and impact delay (hereinafter "delay claim").**

*Id*.

Stromberg further agreed to "stay its delay claim against BELL and USF&G until the final conclusion" of the Government Litigation which, as noted above, included BELL's pass through to the Government of Stromberg's "delay claim" (the "Government Litigation"). *Id*., ¶ 2. Accordingly, the Partial Settlement Agreement stated:

> **Thus, [this] action shall be stayed in its entirety <u>until the final conclusion</u> of the [Government] litigation.**

*Id*. (emphasis added).

Stromberg also agreed to "cooperate with BELL in BELL's prosecution of Stromberg's delay claim in the [Government Litigation], including providing an expert witness, if necessary" and expressly acknowledged that:

> **BELL shall retain full control and discretion with regard to the prosecution and resolution of Stromberg's delay claim.**

*Id*., ¶ 3.

---

**[3]**    For ease of reference, the relevant portions of the Exhibits attached hereto have been highlighted.

3

BELL agreed to ask the Claims Court to make separate findings regarding Stromberg's "delay claim." *Id*., ¶ 4.  In return, subject only to the terms and conditions of ¶ 5 of the Partial Settlement Agreement, Stromberg agreed to:

> **. . . accept the [Claims Court's] findings and damages award, <u>if any</u>.**

*Id*., ¶ 4 (emphasis added).

Pursuant to ¶ 5 of the Partial Settlement Agreement, "<u>after the final conclusion</u> of the [Government Litigation]," Stromberg could move to lift the stay in this action if one of two circumstances occurred:

> **In the event that the Court of Federal Claims determine[d] that BELL did something to prejudice Stromberg's delay claim, or BELL and the Government reach a settlement in the [Government Litigation] and Stromberg, in good faith, is not satisfied with the amount of settlement proceeds, <u>if any</u>, that BELL in its discretion allocates to Stromberg . . .**

*Id*., ¶ 5 (emphasis added).

That same day, January 22, 2004, Stromberg and BELL filed a Stipulated Order Regarding Partial Settlement and Stay of All Other Proceedings ("Stipulated Order").  A copy of the Stipulated Order is attached as Exh. 2.  The Stipulated Order reiterated Stromberg's agreement to stay its claims against BELL and USF&G until final conclusion of the Government Litigation.  *Id*.  On February 4, 2004, this Court approved the Stipulated Order.

The Government Litigation has <u>not</u> concluded.  In October 2007, the Claims Court held a trial (hereafter referred to as the "Claims Court Trial").  On April 21, 2008, the Claims Court issued its Opinion and Order, a copy of which is attached as Exh. 3.  On June 18, 2008, the Government filed a Notice of Appeal to the United States Court of Appeals, a copy of which is attached as Exh. 4.  The Government is appealing, among other things, the Claims Court's

damages award to Stromberg of $812,092.00, plus interest. *See* Exh. 3, Claims Court's Opinion and Order at p. 23. The Government's opening brief is due to be filed by October 3, 2008.

Stromberg admits that, pursuant to the Partial Settlement Agreement and the Stipulated Order, it agreed to stay this action until final conclusion of the Government Litigation. It further acknowledges that, due to the Government's appeal, the Government Litigation has not concluded. Stromberg asserts, however, that this Court should excuse it from its agreement to stay this action until the final conclusion of the Government Litigation. In support of its assertion, Stromberg presents three arguments against BELL, none of which are factually true or legally supported.

First, Stromberg argues that BELL breached the Partial Settlement Agreement by purportedly "failing" to present Stromberg's extended overhead claim (also referred to as "delay claim") at the Claims Court Trial. Stromberg's argument is unfounded and grossly misleading because it omits the fact that its lawyers eliminated that claim prior to the Claims Court Trial. On June 1, 2007, several months before the Claims Court Trial started, Stromberg's lawyers provided BELL with an Amended Expert Report prepared by Stromberg's expert scheduling consultant. An excerpted copy of Stromberg's Amended Expert Report is attached as Exh. 5. Stromberg's Amended Expert Report expressly states that Stromberg's lawyers, Huddles Jones Sorteberg & Dachille, P.C., directed Stromberg's expert scheduling consultant to:

> **. . . remove the section** [of his November 17, 2003 report] **pertaining to Extended Field Overhead since this issue was eliminated at this time. In sum, this report replaces the November 17, 2003 Expert report.**

*See* Exh. 5, Stromberg's Amended Expert report at p. 1 (emphasis added).[4]

---

[4]     Stromberg's Memorandum appended as Exhibit 12 thereto a copy of its Initial Expert Report of November 17, 2003. It did not append or otherwise mention, however, the Amended Expert Report.

In accordance with the Amended Expert Report that BELL received from Stromberg's lawyers, Stromberg's extended field overhead claim was eliminated from the Claims Court Trial, but its impact claim was presented to the Claims Court.[5]  Thus, Stromberg's extended field overhead claim was not presented at the Claims Court Trial because, at the express direction of its lawyers, that claim was "eliminated" from that proceeding.  There is simply no basis for Stromberg to assert that BELL "failed" to present that claim and thereby breached the Partial Settlement Agreement.

Second, Stromberg argues that BELL "fraudulently induced" it into entering into the Partial Settlement Agreement and committed a fraud on this Court when the Stipulated Order was filed, because BELL purportedly had no intention of pursuing Stromberg's extended field overhead claims against the Government.  This argument is utterly untrue.  Until Stromberg's lawyers eliminated Stromberg's extended field overhead claim in June 2007, BELL had passed Stromberg's claim through to the Government.  Among other things, on September 10, 2004, well after the Partial Settlement Agreement was entered into, BELL identified Stromberg's expert scheduling consultant as a potential expert witness in the Government Litigation and referred the Government to a previously-served copy of his November 17, 2003 Expert Report which offered opinions regarding Stromberg's extended field overhead claim.[6]  See Exh. 6, BELL's Expert Witness Designations and Supplemental Interrogatory Responses Regarding Expert Witnesses.

The Partial Settlement Agreement and Stipulated Order were entered into in January 2004.  Over three and one-half years later, in June 2007, Stromberg's lawyers eliminated

---

[5]    The aforementioned damages of $812,092.00 that the Claims Court awarded to Stromberg represented 100% of the impact damages that Stromberg requested at the Claims Court Trial.

[6]    This is the report that, at the direction of Stromberg's lawyers, was replaced by Stromberg's Amended Expert Report of June 1, 2007.

Stromberg's extended field overhead claim from the Claims Court Trial. Obviously, BELL would no longer pursue that claim against the Government after it had been eliminated by Stromberg's lawyers. Given these facts, there is no basis for Stromberg to assert that, in January 2004, BELL fraudulently induced the Partial Settlement Agreement and committed a fraud on this Court via the submission of the Stipulated Order.

Stromberg's third argument is that BELL violated the so-called prevention doctrine by "failing" to ask the Claims Court to address Stromberg's extended field overhead claim. This argument fails not only because Stromberg's lawyers' eliminated that claim from the Claims Court's consideration, but also because the plain terms of the Partial Settlement Agreement show that the prevention doctrine cannot be applied. As noted above, Stromberg expressly agreed in the Partial Settlement Agreement that "BELL shall retain <u>full control and discretion</u> with regard to the prosecution and resolution of Stromberg's delay claim." *See* Exh. 1, Partial Settlement Agreement, ¶ 3 (emphasis added).

Thus, even if Stromberg's lawyers had not eliminated the extended field overhead claim from the Claims Court Trial in June 2007, the Partial Settlement Agreement contemplated that that claim might not be presented to the Claims Court because of BELL's contractual right to exercise full control and discretion. In other words, BELL had the contractual right to "prevent" Stromberg's extended field overhead claim from being presented at the Claims Court Trial. Because BELL had that contractual right, the prevention doctrine is inapplicable. *See Shear v. National Rifle Association*, 606 F.2d 1251, 1256 (D.C. Cir. 1979) (". . . the prevention doctrine does not apply when the contract, in effect, authorizes prevention. This exception has been recognized by the commentators."), *citing*, 5 *Williston on Contracts* § 377A at 235, and 3A

*Corbin on Contracts* § 767 at 545. Hence, "there is no prevention when the contract authorizes a party to prevent a condition from occurring." *Shear*, 606 F.2d at 1256.

Stromberg's Memorandum presents a fourth argument which asserts that BELL "is responsible" for paying Stromberg extended field overhead costs. This argument is irrelevant to Stromberg's Motion because it deals with Stromberg's alleged entitlement to recover damages pursuant to the claims in its Complaint against BELL, and not the issue of whether Stromberg is excused from the stay of those claims that it agreed to in the Partial Settlement Agreement and Stipulated Order. Nevertheless, because Stromberg has asserted entitlement, BELL is constrained to point out that, if necessary and at the appropriate time, the evidence will show that Stromberg's delay claim against BELL is barred by the written subcontract agreement (the "Subcontract") between the parties.[7] An excerpted copy of the Subcontract is attached as Exh. 7. Among other provisions, Stromberg's delay claim against BELL is barred by Section 19 of the Subcontract which provides that, in the event Stromberg is delayed by causes beyond its control:

> . . . **no extension** [of time] **shall be granted unless** a claim in writing therefore is presented to the Contractor [BELL] within five days of the start of such delay . . . **The Subcontractor [Stromberg] expressly agrees that its sole right and remedy in case of any delay** . . . **shall be an extension of time fixed for the completion of work unless and to the extent that the Contractor recovers the same from the Owner** [the Government].

*See* Exh. 7, Subcontract, Section 19 (emphasis added). To the extent that Stromberg claims that BELL is liable to it for delay, its claim is untimely under the Subcontract.

Moreover, Stromberg expressly waived at least part of any delay claim that it may seek against BELL. As Stromberg's Memorandum repeatedly notes, the contract modification by which BELL obtained a payment for delay from the Government ("Mod. 93"), applied to delay due to changes made by August 31, 2000. BELL is not required to allocate any part of the delay

---

[7] Because of its Subcontract with BELL, BELL's alleged liability to Stromberg for delay is determined differently than the Government's potential liability for delay.

payment that it received in Mod. 93 to Stromberg because (i) Stromberg failed to provide BELL the five-day notice required by the Subcontract, and (ii) Stromberg expressly released its claims against BELL for much, if not all, of the period covered by Mod. 93.  Attached as Exh. 8 is a copy of a release executed under oath by Stromberg on September 30, 2000 (the "Sworn Release"), which states the following:

> **In consideration of the payment herewith made, the undersigned does <u>fully and finally release and hold harmless BELL BCI COMPANY [and] its surety . . . through the above date</u> [July 31, 2000] <u>from any and all claims</u>, liens or to claim . . . arising out of this Project . . .**

*See* Exh. 8, Stromberg's Sworn Waiver of Claims (emphasis added).  Thus, through at least July 31, 2000, and possibly thereafter, Stromberg expressly waived delay claims against BELL.[8]

## III.    STATEMENT OF FACTS IN RESPONSE TO STROMBERG'S ASSERTIONS

1.      On March 26, 1998, BELL entered into a contract with the Government to serve as the general contractor for the construction of the Project.  *See* Exh. 3, Claims Court's Opinion and Order dated April 21, 2008, at p. 4.  The original completion date for completion of work on the Project was June 29, 2000.  *Id.*

2.      On April 24, 1998, BELL and Stromberg entered into the Subcontract.  *See* Exh. 7, Subcontract at p. 1.

3.      The Subcontract contains a "flow-down" provision pursuant to which Stromberg "assume[d] toward[s] the Contractor [BELL] all obligations and responsibilities that the Contractor . . . assume[d] toward[s] the owner [Government] . . ."  *See* Exh. 7, Subcontract, Section 1.

4.      Pursuant to Section 19 of the Subcontract, Stromberg agreed that claims for delay against BELL would be subject to the following conditions:

---

[8]      Stromberg executed numerous other Sworn Releases.

> **. . . no extension [of time] shall be granted unless a claim in writing therefore is presented to the Contractor [BELL] within five days of the start of such delay . . . The Subcontractor [Stromberg] expressly agrees that its sole right and remedy in case of any delay . . . shall be an extension of time fixed for the completion of work unless and to the extent that the Contractor recovers the same from the Owner [the Government].**

*See* Exh. 7, Subcontract, Section 19 (emphasis added).

5.      During the course of working on the Project, Stromberg executed numerous Sworn Waivers pursuant to which it expressly released BELL and USF&G from "all claims" through at least July 31, 2000. *See* Exh. 8, Stromberg's Sworn Release.

6.      In mid-December 1998, the Government made a major change to the Project by deciding to add an additional floor. *See* Exh. 3, Claims Court's Opinion and Order dated April 21, 2008, at p. 5.

7.      The Government extended the time to complete the work on the Project several times.  On at least one occasion, the Government extended the contract completion date unilaterally.

8.      On April 14, 2000, the Government issued a <u>unilateral</u> modification to BELL, Mod. 78, pursuant to which the Government unilaterally extended the contract completion date to September 28, 2000. *See* Exh. 3, Claims Court's Opinion and Order dated April 21, 2008, at p. 5.

9.      On October 2, 2000, BELL and the Government executed Mod. 93.  This modification, among other things, extended the contract completion date to April 30, 2001. *See* Exh. 3, Claims Court's Opinion and Order dated April 21, 2008, at p. 6.

10.     Stromberg's Memorandum (*see* p. 4) asserts that Mod. 93 provided BELL with "nearly $2.3 million delay settlement."  As Stromberg's lawyers know from Exhibit 10 to Stromberg's Memorandum, that assertion is untrue. Exhibit 10 to Stromberg's Memorandum is

a copy of the Claims Court's Opinion of July 14, 2006, which denied the Government's and BELL's respective motions for partial summary Judgment. As the Claims Court found, in Mod. 93 the Government paid approximately $700,000 for delays that BELL incurred due to changes that were transmitted by August 31, 2000. *See* Exhibit 10 to Stromberg's Memorandum at pp. 5-6.

11.    Stromberg's Memorandum (*see* p. 4) asserts that Stromberg submitted an initial delay claim to BELL on June 19, 2000. That is not accurate. Stromberg's June 19, 2000 submission did not identify any specific period of time for which Stromberg claimed it was delayed. Rather, Stromberg merely provided BELL with a daily overhead rate of $2,196.38, which it asserted it should apply to any delay period that it might claim in the future.[9]

12.    In fact, it was not until May 15, 2001, when Stromberg submitted what it called its "Preliminary Claim for Additional Costs Stemming from Impact and Delay" (hereafter referred to as "Stromberg's Preliminary Claim"), that Stromberg identified a specific period of time that it was allegedly delayed. A copy of Stromberg's Preliminary Claim is attached as Exhibit 9. As noted on p. 3 thereto, a copy of Stromberg's Preliminary Claim was sent to its lawyer, Roger C. Jones, Esq., a senior partner of Huddles Jones Sorteberg & Dachille, P.C.

13.    Stromberg's Preliminary Claim reveals that the following assertion, which is made repeatedly in Stromberg's Memorandum, is false:

> **At the time Stromberg filed its Complaint [against BELL and USF&G on September 30, 2002] it was unaware that, on October 2, 2000, Bell and the Government had entered into Contract Modification No. 093 ("Mod. 93") in the amount of $2,296,963.**

*See* Stromberg's Memorandum at p. 4, and Exhibit 1 thereto at ¶ 9.

---

[9]    Notably, Stromberg's Memorandum (*see* p. 7) states that Stromberg's daily overhead rate, inclusive of a 10% mark-up for profit, is $931.18. The daily overhead rate asserted in Stromberg's June 19, 2000 submission was more than twice that amount and apparently, therefore, was significantly overstated.

14.     In fact, Stromberg's Preliminary Claim and other documentation prepared by Stromberg's lawyers show that they knew of Mod. 93 at least well over a full year before they filed the Complaint in this action on September 30, 2002. Stromberg's Preliminary Report dated May 15, 2001 states:

> **Stromberg has learned that, in bad faith and in deliberate disregard of our subcontract rights, on October 2, 2000 <u>Bell and the Government entered into Contract Modification No. 093</u> in the amount of $2,296,963 which (unbeknownst to Stromberg) extended the contract completion date to April 15, 2001 and provided Bell with a full equitable adjustment "for all delays resulting form any and all Government changes transmitted to Contractor [BELL] on or before August 31. 31, 2000." (<u>See EXHIBIT B attached hereto</u>).**

*See* Exh. 9, Stromberg's Preliminary Claim (emphasis added).

15.     Similarly, on December 19, 2001, Stromberg's lawyer sent BELL's counsel a letter that transmitted "Stromberg's Final Claim for Additional Costs Stemming From Impact and Delay" ("Stromberg's Final Claim"). In his letter, Stromberg's counsel referred to:

> **. . . the $2,296,963 settlement Bell negotiated with the Owner [the Government] as a "full and equitable adjustment for all delays resulting form any and all Government changes transmitted to the contractor on or before August 31, 2000." (See Contract Modification 93).**

*See* Exh. 10, Stromberg's Lawyer's Letter re: Mod. 93 dated December 19, 2001.[10]

16.     Likewise, Stromberg's Final Claim that was transmitted with this letter from Stromberg's lawyer attached a copy of Mod. 93 as an exhibit thereto. *See* Exh. 11, Stromberg's Final Claim at p. 2.

17.     Therefore, it is an indisputable fact that Stromberg's lawyers knew of Mod. 93 long before the Complaint in this action was filed. Their assertion to the contrary to this Court is false.

---

[10]     The date on the first page of Stromberg's lawyer's letter is erroneously stated as December 19, 1999. The correct date, as noted on the "header" on the second page of the letter, is December 19, 2001.

18.    On April 5, 2002, BELL submitted its REA to the Government for damages it incurred due actions by the Government.  That same day, BELL submitted Stromberg's Final Claim for delay and impact damages to the Government as a separate REA.  On July 1, 2002, the Government's Contracting Officer denied BELL's REA, as well as Stromberg's claims. Thereafter, BELL filed a lawsuit against the Government in the Claims Court seeking, *inter alia*, review of the denial of its REA and of Stromberg's delay and impact damages.  *See* Exhibit 10 to Stromberg's Memorandum, Claims Court's Opinion of July 14, 2006, at p. 4.

19.    As noted previously, Stromberg filed its Complaint in this action on September 30, 2002.

20.    On or about November 17, 2003, Stromberg served BELL with an Expert Report prepared by Stromberg's expert scheduling consultant (hereafter referred to as "Stromberg's Initial Expert Report").  A copy of Stromberg's Initial Expert Report was appended as Exhibit 12 to Stromberg's Memorandum.

21.    Stromberg's Final Claim, which BELL had submitted to the Government's Contracting Officer, asserted extended overhead costs of $934,557.22.  *See* Exh. 11, Stromberg's Final Claim, at p. 2.  Stromberg's Initial Expert Report, however, opined that Stromberg was entitled to recover extended field overhead costs in the amount of $284,010.  *See* Exhibit 12 to Stromberg's Memorandum, Stromberg's Initial Expert Report at p. 2.  Thus, Stromberg's  Initial Expert Report substantially reduced the amount of delay damages that Stromberg had previously claimed against the Government.

22.    On December 1, 2003, less than two weeks after it received Stromberg's Initial Expert Report, BELL served the Government with a copy of Stromberg's Initial Report.  BELL further notified the Government at that time that Stromberg's Initial Expert Report set forth the

revised amount of damages that Stromberg was claiming. *See* Exh. 12, BELL's Initial Disclosures to the Government, ¶ C at p. 2.

23.    Stromberg's Initial Expert Report also contradicted assertions that Stromberg had made previously to this Court about its alleged delay claim. On April 18, 2003, Stromberg filed a Motion for Leave to Serve Discovery with this Court, a copy of which is appended as Exh. 13. In that pleading, Stromberg told this Court that "the vast majority of Stromberg's claims resulted from delays it encountered on the project through August 31, 2000." *See* Exh. 13, Stromberg's Motion for Leave to Serve Discovery at p. 2. Stromberg's Initial Expert Report, however, opined that the alleged delays that Stromberg encountered were during the period after June 29, 2000 and through April 31, 2001. *See* Exhibit 12 to Stromberg's Memorandum, Stromberg's Initial Expert Report at p. 29.

24.    On January 22, 2004, Stromberg, BELL and USF&G entered into the Partial Settlement Agreement. *See* Exh. 1, Partial Settlement Agreement. Pursuant to the Partial Settlement Agreement, Stromberg agreed that :

> **. . . [this] action shall be stayed in its entirety <u>until the final conclusion</u> of the [Government] litigation.**

*Id*., ¶ 2 (emphasis added).

25.    Stromberg also agreed that:

> **BELL shall retain full control and discretion with regard to the prosecution and resolution of Stromberg's delay claim.**

*Id*., ¶ 3.

26.    BELL agreed to ask the Claims Court to make separate findings regarding Stromberg's "delay claim." *Id*., ¶ 4. In return, subject only to the terms and conditions of ¶ 5 of

the Partial Settlement Agreement, Stromberg agreed to "accept the [Claims Court's] findings and damages award, <u>if any</u>."  *Id.* (emphasis added).

27.    Pursuant to ¶ 5 of the Partial Settlement Agreement, "<u>after the final conclusion</u> of the [Government Litigation]," Stromberg could move to lift the stay in this action only if the Claims Court determined that "BELL did something to prejudice Stromberg's delay claim, or BELL and the Government reach a settlement in the [Government Litigation] and Stromberg, in good faith, is not satisfied with the amount of settlement proceeds, <u>if any</u>, that BELL in its discretion allocates to Stromberg."  *Id.*, ¶ 5.

28.    On January 22, 2004, Stromberg and BELL also filed the Stipulated Order that, among other things, reiterated that Stromberg could not move to lift the stay of this action until the final conclusion of the Government Litigation.  *See* Exh. 2, Stipulated Order.

29.    On September 10, 2004, BELL submitted its Expert Witness Designations in the Government Litigation.  At that time, BELL identified Stromberg's expert scheduling consultant as a potential expert witness in the Government Litigation and referred the Government to the previously-served copy of Stromberg's Initial Expert Report.  *See* Exh. 6, BELL's Expert Witness Designations and Supplemental Interrogatory Responses Regarding Expert Witnesses.

30.    On June 1, 2007, several months before the Claims Court Trial, Stromberg's lawyers provided BELL's counsel with a copy of Stromberg's Amended Expert Report.  See Exh. 5, Stromberg's Amended Expert Report at p. 1.

31.    Stromberg's Amended Expert Report expressly states that it was prepared for Stromberg's lawyers, Huddles Jones Sorteberg & Dachille, P.C., and that Stromberg's lawyers directed Stromberg's expert scheduling consultant to:

**. . . remove the section [in Stromberg's Initial Report of November 17, 2003 report]  pertaining to  Extended  Field  Overhead  since  this  issue  was**

**eliminated at this time.  In sum, this report replaces the November 17, 2003 Expert report.**

*See* Exh. 5, Stromberg's Amended Expert report at p. 1 (emphasis added).

32.    On June 4, 2007, BELL's counsel notified Stromberg's lawyers that Stromberg's Amended Expert Report had been received and that he would "transmit a copy to the Government's counsel."  *See* Exh. 13, Email from BELL's Counsel to Stromberg's Lawyers dated June 4, 2007.  BELL transmitted a copy of  Stromberg's Amended Report to the Government.

33.     Stromberg's Memorandum (*see* p. 1) asserts that BELL "failed" to present Stromberg's extended field overhead claim to the Claims Court.  That assertion is utterly misleading because it fails to disclose the fact that Stromberg's lawyers had eliminated that claim from the Claims Court's consideration months before the trial.

34.    Stromberg's Memorandum (*see* p. 10 and Exh. 1 thereto at ¶ 12) repeatedly asserts that "Bell would not permit Stromberg's attorney to participate at trial."  That assertion is false and Stromberg's lawyers know that it is false.  BELL never prohibited Stromberg's lawyer from participating at the Claims Court Trial.

35.    The truth is that Stromberg's lawyers requested BELL to present Stromberg's evidence at the Claims Court Trial because their senior partner, Roger C. Jones, Esq., had a scheduling conflict.

36.    On July 12, 2007, Stromberg's sent BELL's counsel an email that confirmed their request that BELL present Stromberg's evidence at the Claims Court Trial due to Mr. Jones' scheduling conflict.  *See* Exh. 14, Email from Stromberg's Lawyers to BELL re: Presenting Stromberg's Evidence.  That email, which was sent by Stromberg's lawyers in connection with

their representation of another subcontractor to BELL on the Project called NLP Enterprises, Inc. ("NLP"), stated:

> **As you know, <u>this trial date was scheduled during Roger's [Jones] vacation.
> Consequently, as with Stromberg, you will need to present</u> NLP's <u>evidence</u>.**

*Id.* (emphasis added).[11]

37.    BELL not only presented Stromberg's evidence at the Claims Court Trial pursuant to the express request of Stromberg's lawyers, but it also repeatedly asked Stromberg's lawyers to identify all exhibits that they wanted to submit to the Claims Court and, moreover, presented all such exhibits that Stromberg's lawyers identified.  *See* Exh. 15, Email from Stromberg's Lawyer Confirming Transmittal of All Stromberg Trial Exhibits dated October 2, 2007.

38.    In sum, the assertion that BELL prohibited Stromberg's lawyers from participating at the Claims Court Trial is false.

39.    In accordance with its obligations under the Partial Settlement Agreement, BELL asked the Claims Court to make separate findings regarding Stromberg's claims that were presented at trial.

40.    On April 21, 2008, the Claims Court issued its Opinion and Order regarding the evidence that was adduced at the trial.  It made separate findings and awarded Stromberg damages due to Government-caused impacts to its work in the amount of $812,092.00, which represented 100% of the impact damages that Stromberg sought at the trial.  *See* Exh. 3, Claims Court's Order and Opinion at p. 23.

---

[11]    On December 22, 2006, the Claims Court issued an Order that scheduled the trial to start on August 6, 2007.  That day, BELL notified Stromberg's counsel of the August 7, 2007 trial date.  The Claims Court subsequently rescheduled the trial to start on October 15, 2007, due to the serious illness of one of BELL's witnesses.  BELL was requested again to present Stromberg's evidence when the trial started on October 15, 2007.

IV.    **ARGUMENT**

A.    **BELL DID NOT BREACH THE PARTIAL SETTLEMENT AGREEMENT BY "FAILING" TO PRESENT STROMBERG'S EXTENDED FIELD OVERHEAD CLAIM**

It is indisputable that Stromberg's lawyers directed Stromberg's extended field overhead claim to be eliminated from the Claims Court's consideration. Their directive to do so is stated expressly and unequivocally in Stromberg's Amended Expert Report. *See* Exh. 5, Stromberg's Amended Expert report at p. 1. Thus, there is simply no basis for Stromberg to assert that BELL "failed" to present that claim to the Claims Court. Ironically, although Stromberg seeks to invoke the so-called prevention doctrine against BELL (*see* Section C, *infra*), the reality is that Stromberg's lawyers, not BELL, are the ones that prevented the merits of Stromberg's extended field overhead claim from being considered by the Claims Court.

Moreover, even assuming *arugendo* that BELL "failed" to present Stromberg's extended field overhead claim, it would not necessarily have constituted a breach of the Partial Settlement Agreement. As noted previously, Stromberg expressly agreed that BELL had "full control and discretion with regard to the prosecution and resolution of Stromberg's delay claim." *See* Exh. 1, Partial Settlement Agreement, ¶¶ 3-4. Presumably, such full control and discretion would have included the contractual right to "fail" to present Stromberg's claim. That point is academic, however, because Stromberg's lawyers eliminated Stromberg's extended field overhead claim, not BELL.

B.    **BELL DID NOT FRAUDULENTLY INDUCE STROMBERG INTO EXECUTING THE PARTIAL SETTLEMENT AGREEMENT**

As expressly stated in its introductory sentence, the Partial Settlement Agreement was negotiated and agreed to by counsel for BELL and USF&G on one side, and Stromberg's lawyers on the other side. *See* Exh. 1, Partial Settlement Agreement at p. 1 ("This letter shall

confirm the oral agreement we reached today on behalf of our respective clients . . .").
Consistent with that, the Partial Settlement Agreement was signed by Stromberg's lawyers on its
behalf.  *Id*. at p. 2.  Given that Stromberg's lawyers negotiated and executed the Partial
Settlement Agreement, the assertion in Stromberg's Memorandum (*see* p. 16) that Stromberg
was "fraudulently induced . . . into executing the Partial Settlement Agreement" is
extraordinarily dubious on its face.

Stromberg's assertion is not merely dubious, however.  Rather, it is utterly devoid of any
factual or legal support.  The undisputed facts show that BELL prosecuted Stromberg's extended
field overhead claim until Stromberg's lawyers eliminated that claim.  BELL submitted
Stromberg's Final Claim to the Government's Contracting Officer; BELL appealed the
Contracting Officer's denial of Stromberg's Final Claim to the Court of Claims; and BELL
provided the Government with a copy of Stromberg's Initial Expert Report.  *See* Section III,
*supra*, ¶¶ 18-22 and ¶ 29.  Thus, well after entering into the Partial Settlement Agreement, BELL
continued to pursue Stromberg's extended field overhead claim.  Stromberg's assertion that
BELL never intended to prosecute that claim is squarely refuted by the actions that BELL took
before and after entering into the Partial Settlement Agreement.

Obviously, Stromberg cannot in good faith argue fraudulent inducement merely because
the Claims Court did not rule on its extended field overhead claim when, as noted previously, its
own lawyers made the decision to eliminate that claim from the Claims Court's consideration.
Moreover, as a matter of law, Stromberg cannot base a fraud claim merely on BELL's alleged
failure to fulfill a contractual obligation.  *See e.g., Alleco, Inc. v. The Harry & Jeanette Weinberg
Foundation, Inc.*, 340 Md. 176, 196-197, 665 A.2d 1038, 1048 (Md. 1995) (holding that plaintiff
failed to state a claim for fraud and noting that "[o]rdinarily, fraud cannot be predicated on

statements which are promissory in their nature, and therefore an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted.") (citation omitted).  The *Alleco* court did note that a "deliberate misrepresentation of . . . existing intentions . . . may form the basis for an action in fraud or deceit."  *Id*.  340 Md. At 197, 665 A.2d at 1048.  In this action, however, the record shows that BELL continued to prosecute Stromberg's extended field overhead claim well after the Partial Settlement Agreement was executed.  Thus, there is no basis for Stromberg to assert that BELL lacked such an intention at the time it entered into the Partial Settlement Agreement.

Finally, it must be repeated that Stromberg agreed that BELL had full control and discretion over the resolution of its extended field overhead claim, and expressly recognized that it might not receive any money under its claim from either the Court of Claims, or as part of any settlement between BELL and the Government.  *See* Exh. 1, Partial Settlement Agreement, ¶ 3 and ¶ 5.  Hence, Stromberg was not fraudulently induced; rather, it knew and accepted the uncertainty surrounding the presentation of its claim to the Claims Court.

### C.    THE SO-CALLED PREVENTION DOCTRINE IS INAPPLICABLE

At the risk of "beating a dead horse," the express terms of the Partial Settlement Agreement vested BELL with "full control and discretion with regard to the prosecution and resolution of Stromberg's delay claim."  *See* Exh. 1, Partial Settlement Agreement, ¶ 3 (emphasis added).  As a matter of law, "the prevention doctrine does not apply when the contract, in effect, authorizes prevention."  *Shear*, 606 F.2d at 1256 (D.C. Cir. 1979) (citations omitted).  Stated differently, the "[n]on-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."  *In re Peanut Crop Insurance Litigation*, 524 F.3d 458, 476 (4th

Cir. 2008) (holding that the prevention doctrine was inapplicable), *quoting*, *Restatement (Second) of Contracts*, § 225.

The prevention doctrine is inapplicable here because, pursuant to the express terms of the Partial Settlement Agreement, BELL had the full discretion to "prevent" the Claims Court from considering the merits of Stromberg's extended field overhead claim. The irrefutable fact is that Stromberg's lawyers are the ones that actually prevented the Claims Court from considering that claim. Thus, even if the terms of the Partial Settlement Agreement did not render the prevention doctrine inapplicable, Stromberg could not invoke its protection.

### D.    BELL IS NOT RESPONSIBLE TO PAY STROMBERG ITS ALLEGED EXTENDED FIELD OVERHEAD COSTS

Stromberg's Memorandum (*see* p. 20) argues that BELL must pay Stromberg's alleged extended field overhead costs. This argument is irrelevant to the issue of whether Stromberg is excused from its agreement to stay this case until the final conclusion of the Government Litigation. Instead, this argument deals with the alleged merit of the claims that have been stayed in this action. Although Stromberg's Motion is not the proper vehicle to use to address the alleged merits of the stayed claims, BELL is constrained to point out that, if necessary and at the appropriate time, the evidence will show that Stromberg's delay claim against BELL is barred by the express terms of the Subcontract. *See* Exh. 7, Subcontract, Section 19.

As a threshold matter, in order to maintain a delay claim against BELL – as opposed to asserting a claim against the Government – Stromberg must show that it complied with the Subcontract's five-day notice requirement. *See* Exh. 7, Subcontract, Section 19. Stromberg will not be able to show that it complied with that requirement.

Furthermore, as noted above, Stromberg also executed a number of Sworn Releases whereby it released BELL and USF&G from all claims. *See* Exh. 8, Stromberg's Sworn

Release.  Thus, even if Stromberg could meet the Subcontract's notice of claim requirement, it will not be able to resurrect claims that it already released.

BELL has a number of other contractual and equitable defenses that it can present which provide additional bases for defeating Stromberg's extended field overhead claims.  Now is not the time, however, for that exercise.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, BELL respectfully requests the Court to hold an evidentiary hearing; to deny Stromberg's Motion; to award BELL its attorney's fees and costs in responding to Stromberg's Motion; and to award BELL such other relief that the Court deems just and proper.

Respectfully submitted,

BELL BCI COMPANY

By counsel:

Dated:  August 25, 2008

Of Counsel:
Charlie C.H. Lee
MOORE & LEE, LLP
1650 Tysons Boulevard, Suite 1150
McLean, Virginia  22102
(703) 506-2050

_/s/  Richard O. Wolf_____
Richard O. Wolf (Bar No. 04989)
MOORE & LEE, LLP
1650 Tysons Boulevard, Suite 1150
McLean, Virginia  22102
Tel:  (703) 506-2050
Fax:  (703) 506-2051
E-mail: r.wolf@mooreandlee.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of August, 2008, I caused a true and correct copy of

the foregoing to be served via the Court's ECF procedures on plaintiff' counsel:

       Nicole Lefcourt Campbell, Esq.
       William M. Huddles, Esq.
       Huddles Jones Sorteberg & Dachille, P.C.
       10211 Wincopin Circle, Suite 200
       Columbia, Maryland  21044


       Edward N. Hershon, Esq.
       Metals, Inc.
       6701 Distribution Drive
       Beltsville, Maryland 20705


                                     */s/  Richard O. Wolf*
                                     Richard O. Wolf